# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

Nos. 07-3437/08-1139

_____

| | | |
|---|---|---|
| Chris Lowry, by, through, and with his Mother, Wendy Crow; Colton Dougan, by, through, and with his Father, Frank Dougan and his Mother, Leigh Dougan; Michael Joseph, by, through, and with his Mother, Heidi Joseph; Wendy Crow; Frank Dougan; Leigh Dougan; Heidi Joseph, | * * * * * * * * * * | |
| Plaintiffs/Appellees, | * | |
| v. | * * * | Appeals from the United States District Court for the Eastern District of Arkansas. |
| Watson Chapel School District; Charles Daniel Knight, Watson Chapel School District Superintendent, in his individual and official capacities, | * * * * * | |
| Defendants/Appellants, | * * | |
| Charles Daniels, Watson Chapel School Board President; Sandra C. Boone, Vice President, in her individual capacity; Donnie Hartsfield, Secretary, in his individual capacity; Danny Holcomb, member, in his individual capacity; Jim Johnson, member, in his individual capacity; Maxine Nelson, member, in her | * * * * * * * * * * | |

individual capacity; John Treglown,     *
in his individual capacity,     *
           *
        Defendants,     *
           *
Henry Webb, in his individual and     *
official capacities as Principal of     *
Watson Chapel Junior High,     *
           *
        Defendant/Appellant.     *

_____

Submitted: June 13, 2008
Filed: September 2, 2008

_____

Before SMITH and GRUENDER, Circuit Judges, and ROSENBAUM,[1] District
      Judge.

_____

SMITH, Circuit Judge.

Chris Lowry, Colton Dougan, and Micheal Joseph (collectively "plaintiffs"),[2] students in the Watson Chapel School District ("school district") during the events in question, brought this action under 42 U.S.C. § 1983, claiming that the school district, the school district's superintendent, the principal of Watson Chapel Junior High, and the school district's school board members (collectively referred to as "defendants")[3]

_____

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, sitting by designation.

[2]Plaintiffs brought this action through their legal representatives, Wendy Crow, Frank Dougan, Leigh Dougan, and Heidi Joseph.

[3]Superintendent Charles Daniel Knight was sued in his individual and official capacities. Watson Chapel Junior High principal Henry Webb was sued in his individual and official capacities. School board members Charles Daniel, Sandra C.

violated plaintiffs' rights under the First and Fourteenth Amendments. At the beginning of the trial, the district court[4] held that plaintiffs had established a violation of their constitutional rights and, accordingly, submitted only the issue of damages to the jury. The jury found that plaintiffs had proven neither compensatory nor punitive damages and awarded each plaintiff zero dollars—subsequently the district court granted plaintiffs' motion to amend the judgment to reflect an award of nominal damages. The district court also issued a permanent injunction and granted plaintiffs' motion for attorneys' fees and expenses. Defendants now appeal, arguing that the district court erred in: (1) holding that plaintiffs' First Amendment rights were violated; (2) granting plaintiffs' motion to amend the jury verdict to reflect nominal damages; (3) making the preliminary injunction permanent in part; and (4) awarding plaintiffs attorneys' fees and costs. We affirm.

## I. *Background*

In the summer of 2006, the school district implemented a mandatory school uniform policy ("the policy"), with specific provisions focused on grades seven through twelve. The school board intended the policy to "promote equal educational opportunity through economical access to appropriate school clothing and orderly, uniform apparel standards for students." The policy required students to "wear the school uniform while in school, on school buses, and at designated school bus stops." Paragraph 17 of the policy stated that "any attempt to defeat the uniformity intended by this policy is prohibited."

---

Boone, Donnie Hartsfield, Danny Holcomb, Jim Johnson, Maxine Nelson, and John Treglown were sued in their individual capacities. Defendants who remained in the case following the district court's partial grant of summary judgment were the school district, Charles Daniel Knight, and Henry Webb.

[4]The Honorable J. Leon Holmes, Chief Judge, United States District Court for the Eastern District of Arkansas.

Several students and parents opposed the policy or the way it was enforced, and some of these parents and students organized a protest. On September 30, 2006, these parents and students handed out black armbands to be worn to school in protest of the policy on October 6, 2006. On that day, several junior and senior high school students wore the black armbands but did not wear them over any part of the school uniform. The school construed the student's conduct as an attempt to defeat the uniformity intended by the policy and disciplined the students who wore the armbands citing their violation of the uniform policy. On its face, the school uniform policy allows students to wear jewelry, including wristbands,[5] "but the jewelry may not overlap any part of the uniform."[6] Plaintiffs each wore the armbands to school either on the wrist, forearm or biceps and none wore the armband over any part of the uniform. Each plaintiff was disciplined for wearing the armband.

Lowry also handed out a flyer critical of the school uniform policy without obtaining approval from the principal before doing so. The one-line 2006-2007 student literature review policy prohibited the "distribution of petitions or other printed matter not approved in advance by the principal." Lowry was also disciplined for violation of the student literature review policy.

On October 10, 2006, plaintiffs filed a complaint claiming that defendants violated the First and Fourteenth Amendments by punishing plaintiffs for wearing

[5]Dougan wore a white, stretchy rubber bracelet that said "Live Pure: 1 Timothy 4:12" every day, and he was never disciplined for wearing this adornment. Other students wore black rubber wristbands that said "Watson Chapel" that one witness testified were sold at a pep rally.

[6]The policy also stated that "No towel, scarf, bandana, do-rag, shirt, string, chain, jewelry, special button, insignia, label, marking, different-colored stitching, fringe, brad, stud, picture, logo, ribbon, embroidery, initials, monogram, special buckle, or any other form of adornment may be worn on or over any part of the uniform, except the school name, school logo, or school insignia."

black armbands as a symbol of protest. The complaint requested declaratory relief, preliminary and permanent injunctive relief, damages, and attorneys' fees and costs. Plaintiffs simultaneously moved for a preliminary injunction to stop defendants from: (1) disciplining plaintiffs in any way for wearing the black armbands; (2) taking any further disciplinary action against plaintiffs on account of the black armbands; and (3) excluding plaintiffs from participation in school clubs or extracurricular activities. The motion also requested that defendants be ordered to expunge the discipline of plaintiffs related to wearing the black armbands from all student records. The district court granted the motion and ordered that defendants be preliminarily enjoined from disciplining any student who wore a band substantially similar to plaintiffs' around the wrist.

On February 22, 2007, plaintiffs filed an amended complaint which included three new claims for relief in addition to the original claim, which was count one: (1) discipline of students for wearing armbands violated the First Amendment; (2) the student apparel policy violated the First Amendment; (3) defendants' enforcement of the student apparel policy violated plaintiffs' right to due process; (4) the student literature policy violated the First Amendment.

Subsequently, defendants filed a motion for partial summary judgment arguing that the school board members and administrators were entitled to qualified immunity on all of the claims against them in their individual capacities. The motion was granted in part and denied in part. In its order and opinion addressing this motion, the district court found that the student uniform policy contravened no provision of the Constitution and that, in the alternative, a reasonable school board member would not have known that the policy was unconstitutional. As to the student literature review policy, the district court surmised that we, the Eighth Circuit, would likely hold the 2006-2007 student literature review policy unconstitutional, but the district court could not find that the law was so clearly established that school board members should have known that it was unconstitutional. Therefore, the school board members

were entitled to qualified immunity on that issue. Because there was a genuine issue of material fact as to whether Knight and Webb imposed discipline to suppress a viewpoint, the court denied summary judgment on the issue of qualified immunity with respect to the claims against Knight and Webb in their individual capacities. The court found that there was evidence that the discipline was imposed to suppress a particular viewpoint and that, absent evidence that wearing the armbands or distributing the flyers would substantially interfere with the work of the school, the right of the students to engage in such conduct was established in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969).

As the trial began on September 11, 2007, defendants stipulated that: (1) the discipline imposed on plaintiffs for wearing black armbands to school on October 6, 2006, was imposed because the black armbands signified disagreement with the student apparel policy; and (2) the wearing of the black armbands caused no material disruption or substantial interference with school. Based on these stipulations, the district court held that the facts necessary to establish a violation of plaintiffs' rights under the First and Fourteenth Amendment as outlined in *Tinker* were no longer in dispute, leaving damages as the only factual issue for the jury.[7] The district court instructed the jury, without objection, "If you find that the plaintiffs' damages have no monetary value, then you must return a verdict for the plaintiffs in the nominal amount of One Dollar ($1.00)."

On September 13, 2007, the jury found, in relevant part, that plaintiffs each had proven zero dollars in damages by a preponderance of the evidence. The next day, the court entered judgment in favor of Knight and Webb on plaintiffs' claims against them in their individual capacities for money damages. In the weeks following, plaintiffs

---

[7]At the close of plaintiffs' case, the district court entered judgment as a matter of law on count three against plaintiffs finding that the enforcement of the student apparel policy did not violate their right to due process.

timely filed a motion to alter or amend the judgment to reflect an award of one dollar in nominal damages. The court granted the motion.

On October 31, 2007, the district court held that the previously entered preliminary injunction would be made permanent in part and dissolved in part. The court permanently enjoined the defendants from disciplining any student for wearing a band substantially similar to plaintiffs' armband around the wrist or any part of the arm not touching or covering any part of the school uniform. The court dissolved as moot that portion of the injunction enjoining defendants from using the events of October 6, 2006, in progressive discipline or to the detriment of plaintiffs. The district court also declined to enjoin the 2006-2007 student literature policy because that policy was no longer in effect.

Two weeks later, plaintiffs filed an application for fees and expenses seeking an award of attorneys' fees in the amount of $57,060.00 and an expenses award of $8,101.54. They titled this document "Plaintiffs' Application for Fees and Expenses" and attached several affidavits and exhibits to the document. This fee represented a $17,235.50 reduction from their total fee based on plaintiffs' attorneys' redacting time spent on non-prevailing issues. On December 20, 2007, the district court entered judgment for attorneys' fees and expenses in favor of plaintiffs against the school district in the amount of $45,601.54 plus post-judgment interest—$37,500 for attorneys' fees and $8,101.54 for out-of-pocket expenses.

## II. *Discussion*

Defendants argue on appeal that the district court erred in: (1) holding that plaintiffs' First Amendment rights were violated; (2) granting plaintiffs' motion to amend the jury verdict to reflect nominal damages; (3) making the preliminary injunction permanent in part; and (4) awarding plaintiffs' attorneys' fees and costs.

A. *First Amendment Violation*

Defendants argue that the district court erred in holding that discipline of plaintiffs for wearing armbands that protested the school's dress code was unconstitutional.

> In reviewing a district court's judgment following a bench trial, we normally review the court's factual findings for clear error and its conclusions of law de novo. An appellate court's review, however, is unique in the context of a First Amendment claim. When such a claim is raised, we must make an independent examination of the whole record . . . to assure . . . that the judgment does not constitute a forbidden intrusion on the field of free expression.

*Doe v. Pulaski County Special Sch. Dist.*, 306 F.3d 616, 621 (8th Cir. 2002) (internal citations and quotations omitted).

On the morning of trial, defendants stipulated that: (1) the discipline imposed on plaintiffs for wearing black armbands to school on October 6, 2006, was imposed because the black armbands signified disagreement with the student apparel policy; and (2) the wearing of the black armbands caused no material disruption or substantial interference with school. In light of these stipulations, the district court held that the facts necessary to establish a violation of plaintiffs' rights under the First and Fourteenth Amendment, as interpreted in *Tinker,* were no longer in dispute. 393 U.S. 503 (1969). We agree.

In *Tinker,* the Supreme Court held that a school's regulation prohibiting students from wearing armbands to school and suspending students refusing to remove the armbands was an unconstitutional denial of the students' right to free expression. *Id.* at 514. The facts here nearly mirror *Tinker.* There, a group of adults and students in Des Moines, Iowa, held a meeting at a student's home to discuss publicizing their objections to the Vietnam war and decided to wear black armbands on a specific date to show their support for a truce. *Id.* at 504. The principals of the schools heard about

the planned protests and, before the date came, they passed a policy that any student wearing an armband to school would be asked to remove it and be suspended if he refused. *Id*. When the day came, some students wore the black armbands, and they were sent home and told they were suspended until they returned without their armbands. *Id*. The Supreme Court reversed a decision of the district court and of this court upholding "the constitutionality of the school authorities' action on the ground that it was reasonable in order to prevent disturbance of school discipline." *Id*. at 504–05. The Supreme Court stated:

The District Court recognized that the wearing of an armband for the purpose of expressing certain views is the type of symbolic act that is within the Free Speech Clause of the First Amendment. As we shall discuss, the wearing of armbands in the circumstances of this case was entirely divorced from actually or potentially disruptive conduct by those participating in it. It was closely akin to 'pure speech' which, we have repeatedly held, is entitled to comprehensive protection under the First Amendment. First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years . . . . The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures-Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes. On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools . . . . The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or deportment. It does not concern aggressive, disruptive action or even

-9-

group demonstrations. Our problem involves direct, primary First Amendment rights akin to 'pure speech.'

*Id*. at 505–07 (internal citations and quotations omitted).

Defendants attempt to distinguish *Tinker* by emphasizing that the *Tinker* students protested the federal government's Vietnam war policy, whereas here the protest object was merely a school dress code. This distinction is immaterial. Whether student speech protests national foreign policy or local school board policy is not constitutionally significant. As the Supreme Court stated in *W. Va. State Bd. of Educ. v. Barnette*:

> Such Boards are numerous and their territorial jurisdiction often small. But small and local authority may feel less sense of responsibility to the Constitution, and agencies of publicity may be less vigilant in calling it to account. The action of Congress in making flag observance voluntary and respecting the conscience of the objector in a matter so vital as raising the Army contrasts sharply with these local regulations in matters relatively trivial to the welfare of the nation. There are village tyrants as well as village Hampdens, but none who acts under color of law is beyond reach of the Constitution.

319 U.S. 624, 637–38 (1943). Defendants also point out that the school in *Tinker* adopted its regulations for the specific purpose of stopping rumored protests, while here the student apparel policy was in place before any mention of a protest occurred. However, the board's intent in creating and its timing of enforcement of the student uniform policy are irrelevant. The constitutionality of the uniform policy is not at issue—it has been deemed constitutional. We find defendants' attempts to meaningfully distinguish *Tinker* unconvincing. We hold that *Tinker* is so similar in all constitutionally relevant facts that its holding is dispositive. In both cases, a school district punished students based on their non-disruptive protest of a government

-10-

policy. The district court was correct to find that, in light of defendants' fact stipulations, a violation of plaintiffs' First Amendment rights has been established.

Defendants also argue the district court was wrong to apply *Tinker* here because subsequent case law has narrowed *Tinker's* scope. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685–86 (1986) (holding that the school district's discipline of a student for delivering a sexually explicit though not legally obscene speech at a school assembly was constitutional and that the school was entitled to dissociate itself from the speech to demonstrate that vulgarity was inconsistent with the fundamental values of public school education); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272–73 (1988) (concluding "that the standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression").

Recently, in *Morse v. Frederick*, the Supreme Court held that "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use." — U.S. —, 127 S. Ct. 2618, 2622 (2007). The Supreme Court held that the school officials "did not violate the First Amendment by confiscating the pro-drug banner and suspending the student responsible for it." *Id*. The Supreme Court also stated that it distilled two basic principles from *Fraser*:

> First, *Fraser's* holding demonstrates that the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings. Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected. In school, however, Fraser's First Amendment rights were circumscribed in light of the special characteristics of the school environment. Second, *Fraser* established that the mode of analysis set forth in *Tinker* is not absolute. Whatever approach *Fraser* employed, it certainly did not conduct the "substantial disruption" analysis prescribed by *Tinker*.

-11-

*Id.* at 2626–27 (internal citations and quotations omitted). Defendants accurately summarize these Supreme Court holdings described above. Yet, *Tinker* remains good law though modified for the circumstances described in *Fraser* and *Morse* neither of which obtain here. Neither *Fraser* nor *Morse* involved punishment of a non-disruptive student protest that violated no school policy based upon student viewpoint. We, therefore, apply *Tinker*.[8]

---

[8]Defendants also argue that on the morning of trial the district court held the 2006–2007 student literature policy unconstitutional and in so doing, ruled on a moot issue because by that time defendants had instituted a new student literature policy. The student literature review policy issue was partially disposed of at the summary judgment stage. In the district court's ruling on defendants' partial motion for summary judgment, the district court surmised that we would find the student literature policy unconstitutional but granted summary judgment to the school board because the district court found that the right at issue was not clearly established. The record indicates that, tied to this issue of the student literature policy, there was no damage finding, no declaratory relief, no injunction, and no causation finding. We would decline to review this issue if it were clear that our only basis for review was the preliminary finding of the district court that we "probably" would have held the literature policy unconstitutional. *See Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007) ("Article III of the United States Constitution confines the jurisdiction of federal courts to justiciable cases and controversies."). However, the record is unclear whether plaintiffs sought attorneys' fees based on the student literature policy—during oral argument plaintiffs' counsel stated that no attorneys' fees were requested based on the student literature policy, but both the exhibits attached to the application for fees and the district court opinion addressing fees include discussion of the student literature review policy. Even assuming that the student literature review policy affected the attorneys' fee award, or at least was included in the request, mootness is not an issue because the voluntary cessation exception to the mootness doctrine applies—defendants' voluntary change of the potentially unconstitutional policy did not moot the issue. *See Charleston Housing Authority v. United States Dept. of Agriculture*, 419 F.3d 729, 740 (8th Cir. 2005) ("[I]n general, a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.") (internal quotations and citation omitted); *see also United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) ("Mere voluntary cessation of allegedly illegal

B. *Motion to Amend the Judgment*

Defendants also argue that the district court erred in granting plaintiffs' motion to amend the judgment regarding nominal damages.

> A district court has broad discretion in determining whether to grant or deny a motion to alter or amend judgment pursuant to Rule 59(e), and this court will not reverse absent a clear abuse of discretion. It should be noted that Rule 59(e) motions serve the limited function of correcting manifest errors of law or fact or to present newly discovered evidence.

*United States v. Metro. St. Louis Sewer Dist.*, 440 F.3d 930, 933 (8th Cir. 2006) (internal citations and quotations omitted).

Defendants claim that plaintiffs waived any right to nominal damages after failing to raise the issue of inconsistent verdicts before the jury was released. According to defendants, the verdict is inconsistent because although the jury was instructed that it must award nominal damages, it returned a verdict awarding plaintiffs zero dollars. Defendants argue that the jury chose to disregard the award of nominal damages because it felt that plaintiffs were not entitled to even nominal damages. A party waives an objection to an inconsistent verdict if an objection is not made before the jury is discharged. *See Dairy Farmers of Am., Inc. v. Travelers Ins. Co.*, 391 F.3d 936, 945 (8th Cir. 2004) (finding that "DFA waived its claim of inconsistent verdicts by failing to object to the inconsistency before judgment was entered"). However, we agree with the district court's finding that there is no inconsistent verdict here. To be inconsistent, a jury verdict must reach contradictory

---

conduct does not moot a case; if it did, the courts would be compelled to leave (t)he defendant . . . free to return to his old ways. A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.") (internal quotations and citations omitted).

factual findings. *See e. g., Doe v. Washington County*, 150 F.3d 920, 923–24 (8th Cir. 1998) ("The jury found liability on the part of the county, but not on the part of the sheriff in his official capacity. The county correctly asserts that the jury's verdict is inconsistent in this respect. A suit against a county official in his official capacity is the equivalent of a suit against the county itself. The official is distinct only in his individual capacity"). The jury's failure to follow the court's instruction is not perforce an inconsistent verdict requiring that it be raised before the jury was released. There is no inconsistency between the jury finding of no damages and any other aspect of the jury verdict. Waiver is not an issue here.

As the district court found, pursuant to *Risdal v. Halford,* nominal damages must be awarded when a plaintiff establishes a violation of the right to free speech. 209 F.3d 1071, 1072 (8th Cir. 2000) (holding that an award of nominal damages is required "upon proof of an infringement of the first amendment right to speak"). The jury was required to award plaintiffs nominal damages, and therefore, the district court did not abuse its discretion in amending the judgment to reflect a nominal damage award as a matter of law.

## C. *Permanent Injunction*

Defendants next argue that the district court erred in permanently enjoining them from disciplining any student who wears a band substantially similar to the ones plaintiffs wore around the wrist. We review the district court's issuance of a permanent injunction for abuse of discretion. *Kennedy Bldg. Assoc. v. CBS Corp.*, 476 F.3d 530, 533–34 (8th Cir. 2007).

A court must consider the following factors in determining whether to issue a permanent injunction: (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; (3) whether the movant proves actual success on the merits; and (4) the public interest. *See Guttau*, 190 F.3d at 847 (adapting the preliminary injunction factors announced in *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981), to a review of a permanent injunction).

*Forest Park II v. Hadley*, 336 F.3d 724, 731 (8th Cir. 2003).

Defendants argue that there has been no evidence of irreparable harm to students other than plaintiffs, and so the injunction should have been denied. However, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). We hold that the district court properly weighed the factors noted above, including balancing the harms, and did not abuse its discretion in permanently enjoining defendants from disciplining any student for wearing a band substantially similar to those worn by plaintiffs in this case.

## D. *Attorneys' Fees*

Finally, defendants argue that the district court erred in awarding plaintiffs attorneys' fees and costs. "We review de novo both the determination of whether a litigant is a prevailing party, and the legal issues related to the award of attorney fees." *Advantage Media, L.L.C. v. City of Hopkins*, 511 F.3d 833, 836 (8th Cir. 2008) (internal quotations and citations omitted). We review the actual award of attorneys' fees and costs for abuse of discretion. *Thompson v. Wal-Mart Stores, Inc.*, 472 F.3d 515, 516 (8th Cir. 2006). And, we review the district court's application of its local rules for abuse of discretion. *Northwest Bank and Trust Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 725 (8th Cir. 2003).

Pursuant to 42 U.S.C. § 1988(b) "[i]n any action or proceeding to enforce a provision of section[] . . . 1983 . . . of this title . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. . . ."

Defendants first argue that the district court should have dismissed the applications for fees and costs because plaintiffs failed to file the proper pleadings with the district court. Defendants argue that plaintiffs violated Federal Rule of Civil Procedure 54(d)(2) and local rules by titling the document that they filed an "application" instead of a "motion." According to Federal Rule of Civil Procedure 54(d)(2)(A), "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Eastern District of Arkansas Local Rule 54.1(a) states "[i]n any case in which attorney's fees are recoverable under the law applicable to that case, a motion for attorney's fees shall be filed with the Clerk . . . ."

Defendants also argue that plaintiffs' application should have been dismissed because it was filed as one document and Eastern District of Arkansas Local Rule 7.2(a) requires that "[a]ll motions except those mentioned in paragraph (d) shall be accompanied by a brief consisting of a concise statement of relevant facts and applicable law." Here, plaintiffs did not attach a brief to the application.

Defendants brought these errors to the district court's attention below, and plaintiffs requested that the district court look past the violations. The court ruled on the merits, granting attorneys' fees and expenses, without expressly addressing these two issues. Our case law indicates that we may assume that the district court implicitly ruled to allow the application to be treated as a motion and a brief. *See Sugarbaker v. SSM Health Care*, 187 F.3d 853, 855 (8th Cir. 1999) (assuming that the district court implicitly gave hospital leave to file its motion out of time when it addressed the merits of hospital's fee request). We conclude that it was not an abuse of discretion for the district court to excuse the minor pleading errors cited by defendants. Designating

-16-

the motion an application was a de minimis error—the only discrepancies from the federal and local rules was its title and its status as a single pleading rather than two separate documents. We believe the district court implicitly found that these errors were not enough to merit dismissal of the pleadings, or even enough to require amendment. We conclude that decision was not an abuse of discretion because the application contained all of the necessary information, was timely filed, and defendants have not claimed they were prejudiced. Rather, defendants emphasize alleged silver bullet technicalities that would dispatch plaintiffs' attorneys' fees. The district court acted within its discretion by rejecting defendants' argument that the pleading was insufficient.

Next, defendants argue that because plaintiffs only received nominal damages they should not receive attorneys' fees, or at most, a very small amount—in essence defendants argue that plaintiffs' victory was merely technical or de minimis.[9]

---

[9]Although defendants do not directly argue on appeal that plaintiffs do not qualify as a prevailing party, as a preliminary matter, we affirm the district court's finding that plaintiffs qualify as a prevailing party for purposes of an attorneys' fee award. "At the outset we note[] that no fee award is permissible until the plaintiff has crossed the 'statutory threshold' of prevailing party status." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989) (holding that plaintiffs were prevailing parties because they obtained judgment vindicating their First Amendment rights as public employees and materially altered the school district's policy limiting the rights of teachers to communicate with each other concerning employee organizations and union activities.) The Supreme Court has stated:

[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to affec[t] the behavior of the defendant toward the plaintiff. Only under these circumstances can civil rights litigation effect the material

Defendants cite *Farrar v. Hobby* to support this argument. 506 U.S. 103, 114–15 (1992) ("Where recovery of private damages is the purpose of . . . civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought") (quoting *Riverside v. Rivera*, 477 U.S. 561, 585 (1986)). In *Farrar*, private damages were the purpose of the litigation, and of the $17 million requested in that case, the plaintiff received only nominal damages and no injunctive or declaratory relief. *Id.* at 107–08. Here, in contrast, the purpose of the litigation was not private damages. The Supreme Court has stated that:

> Because damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief. Rather, Congress made clear that it intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature.

*Riverside,* 477 U.S. at 575 (internal citations and quotations omitted). Although plaintiffs received only nominal damages, their victory was not merely technical.

> alteration of the legal relationship of the parties and thereby transform the plaintiff into a prevailing party. In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."

*Farrar,* 506 U.S. at 111–12.

Here, the district court held that plaintiffs were the prevailing party for purposes of an attorneys' fee award. And we agree because they succeeded in effecting the legal relationship between the parties by obtaining both preliminary and permanent injunctions and nominal damages. The question is, therefore, not if plaintiffs should have received an attorneys' fee award but how much that award should be.

Plaintiffs obtained an injunction that benefitted all of the students in the school district, and the free speech right vindicated was not readily reducible to a sum of money. We hold that the district court did not err in finding that plaintiffs' victory was more than merely technical.

Defendants also argue that because plaintiffs prevailed on only one of the four counts in their complaint, the district court should have awarded 25% of fees instead of 50%. The district court awarded $37,500 in attorneys' fees, which is approximately one-half of the total fees incurred. Defendants' contention that the district court was required to calculate the award based on a percentage of counts in the complaint on which plaintiffs' received damages lacks precedential support. Instead, our case law has rejected a similar, arithmetically simplistic fee-calculation argument. *See Wal-Mart Stores, Inc. v. Barton*, 223 F.3d 770, 772 (8th Cir. 2000) (rejecting the argument that because Barton only prevailed on one of her six original claims, her fee award of 70% was too high).

In fact, "[t]here is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." *Hensley v. Eckerhart*, 461 U.S. 424, 436–37 (1983). The Supreme Court has established:

> [C]ertain principles to guide the discretion of the lower courts in setting fee awards in cases where plaintiffs have not achieved complete success. Where the plaintiff's claims are based on different facts and legal theories, and the plaintiff has prevailed on only some of those claims, we indicated that [t]he congressional intent to limit [fee] awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim. In the more typical situation, where the plaintiff's claims arise out of a common core of facts, and involve related legal theories, the inquiry is more complex. In such a case, we indicated that the most critical factor is the degree of success

-19-

obtained. We noted that in complex civil rights litigation, the plaintiff often may succeed in identifying some unlawful practices or conditions, but that the range of possible success is vast, and the achievement of prevailing party status alone may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved. We indicated that the district courts should exercise their equitable discretion in such cases to arrive at a reasonable fee award, either by attempting to identify specific hours that should be eliminated or by simply reducing the award to account for the limited success of the plaintiff.

*Tex. State Teachers Ass'n,* 489 U.S. at 789–90 (internal citations and quotations omitted).[10]

It is certainly true that the district court was required to take into account the amount of success plaintiffs had in determining a percentage of recovery. It did so. The district court considered plaintiffs' success on their claim that defendants violated their right to free speech and that plaintiffs received nominal damages and a preliminary and permanent injunction prohibiting defendants from disciplining any

_____

[10]In *Hensley*, the Supreme Court stated that "[t]he amount of the fee, of course, must be determined on the facts of each case. On this issue the House Report simply refers to twelve factors. . . . " 461 U.S. at 429–30. Further, the Court noted the following as factors the district court should take into consideration:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id*. at 430 n.3.

student wearing an armband similar to the band worn in this case. Plaintiffs also received a preliminary injunction preventing defendants from counting the protest against the plaintiffs in the school's progressive discipline system. The district court concluded that

> in view of the time expended, the results obtained, the skill necessary to perform the legal services properly, the customary fee for such services, and the experience, reputation, and ability of the attorneys, and after considering the record of this case as a whole, . . . [$37,500] represent[ed] a reasonable fee.

We hold that the district court was acting within its discretion in deciding such a fee award.[11]

### III. *Conclusion*

For the foregoing reasons, we affirm the district court.

_____

_____

[11]Defendants argue that the school district admitted from the beginning of the litigation that plaintiffs were punished for protesting the student apparel policy and, therefore, plaintiffs' counsel should not be compensated for trial preparation. We find this argument unpersuasive and agree with the district court that the record shows instead that it first appeared that defendants may concede that they punished plaintiffs based on their viewpoint less than a week before trial. Therefore, the district court did not abuse its discretion in awarding fees for trial preparation time.

We also reject defendants' argument that after plaintiffs were successful on the preliminary injunction hearings, the holdings of the district court were essentially the same, and therefore, time attorneys spent on the case after that point was unnecessary. We agree with plaintiffs that if the litigation had ended at that point, the injunction would have been dissolved and the parties would not have been able to secure a permanent injunction or any fee award.