# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3099

_____

| | | |
|---|---|---|
| B.W.A., a Minor; Marc Archambo, individually and as Next Friend of B.W.A. , A Minor; Tamra Archambo, individually and as Next Friend of B.W.A. , A Minor; R.S., a Minor; Opal Scaggs, as Next Friend of R.S.; S.B., a Minor; Patricia Hill, as Next Friend of S.B., | * * * * * * * * | |
| | * | |
| Plaintiffs - Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Farmington R-7 School District; W. L. Sanders, in his official Capacity as Superintendent of Farmington R-7 School District; Judith Delaney, in her official Capacity as Assistant Superintendent of Farmington R-7 School District; Mark Kraus, in his official capacity as Teacher/Instructor of Farmington R-7 School District; Susan Barber, in her official capacity as Assistant Principal of Farmington R-7 School District; Todd McKinney, in his official capacity as Dean of Students of Farmington R-7 School District, | * * * * * * * * * * * * * * * | |
| | * | |
| Defendants - Appellees. | * | |
| _____ | * | |
| | * | |

United States of America,          *

                              *

       Amicus on Behalf of    *

       Appellee.              *

_____

Submitted: September 22, 2008
Filed:  January 30, 2009

_____

Before LOKEN, Chief Judge, WOLLMAN and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

B.W.A., a minor and student at Farmington High School ("Farmington High"), along with fellow students R.S. and S.B., brought this First Amendment action against Farmington R-7 School District ("the District") and its school officials after they were sent home for refusing to remove items of clothing depicting the Confederate flag symbol. After extensive discovery, the district court[1] granted the District's motion for summary judgment on the ground that Farmington High school officials had reason to believe that students displaying the Confederate flag would cause a substantial and material disruption. We affirm.

I. *Background*

B.W.A., R.S., and S.B. were students at Farmington High,[2] which is part of the District. They were suspended during the 2006-2007 school year for wearing clothing

_____

[1]The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

[2]Approximately 1,100 students attend Farmington High and only 15 to 20 are black.

depicting the Confederate flag. Prior to their suspensions, several racially-charged incidents occurred in the District during the preceding school year.

In the first incident, a white student urinated on a black student while allegedly saying "that is what black people deserve." As a result, the black student withdrew from school and moved to another district. A second incident occurred when white students—one carrying an aluminum baseball bat—showed up at a black student's home. They made racial comments such as "anything that is not white is beneath them." When the black student's mother tried to separate the students, one of the white students struck her in the eye. A melee ensued involving her son and the white students. Later, "people" drove around the black student's home screaming racial epithets and threatening to burn down the home. A few days later, a group of white students surrounded the same black student and confronted him at Farmington High. As a result, the black student withdrew from school, and his family moved out of the District.

A third incident occurred during a basketball tournament hosted by the Central School District when a heated confrontation erupted during a game between Farmington High and Festus Senior High School.[3] During the game, a skirmish broke out after two Farmington High players allegedly used racial slurs against two black players from Festus. Shortly after the incident, the two Festus students filed a complaint with the Missouri State High School Activities Association, complaining that the two Festus students were the victims of racial slurs throughout the game with Farmington High. In that same time period, supporters of the Festus students distributed flyers accusing school administrators of not doing anything to prevent or stop the racial slurs. The flyer also noted that a Confederate flag was hanging in the hallway near the locker rooms during the game. The Festus students also reported the

---

[3]According to a Farmington official, Festus has a "greater African American population than . . . Farmington."

incident to the United States Department of Justice's Office of Civil Rights (OCR), which conducted an investigation. As a result of the incident, the two teams no longer play each other unless required to by their athletic conference.

Following the aforementioned incidents, the superintendent, relying on his authority to prevent disruption to the education of high school students, banned students from wearing clothing that depicted the Confederate flag.[4] The superintendent based his decision on the belief that the incidents within the District were race-related.

After the District banned clothing depicting the Confederate flag, additional racial incidents occurred prior to the 2006-2007 school year, including a white student

---

[4]In 1995, the District adopted a student dress code. This dress code states:

The Board of Education recognizes the value of allowing individual student expression as well as the necessity of protecting student health and safety and maintaining an atmosphere conducive to education. Student dress code procedures must be designed with the goal of balancing these competing interests.

All dress code procedures will adhere to health and safety codes and comply with applicable law. Dress that materially disrupts the education environment will be prohibited. No procedure will impose dress and grooming rules based on gender in violation of Title IX. District procedures will specifically define ambiguous terms, and examples will be provided when practical.

The Farmington High School Student and Parent Information Guide, which every student received at the beginning of the 2006-2007 school year, contained this dress code.

drawing swastikas and writing "white power" song lyrics in his notebook.[5] Additionally, school officials punished students for making racial slurs. Also, a white student told his teacher that the "n*gg*rs [are] here" while pointing at a visiting track team. This student also drew a swastika on the chalkboard.

During the 2006-2007 school year, B.W.A. wore a baseball cap to school bearing the Confederate flag with the words "C.S.A., Rebel Pride, 1861" written on it. A Farmington teacher advised B.W.A. that he had to remove the hat and keep it in his backpack the rest of the day. The next day, B.W.A. wore a T-shirt and belt buckle containing an image of the Confederate flag and the words "Dixie Classic." An assistant principal at Farmington requested that he remove the items. When B.W.A. refused, the assistant principal suspended B.W.A. for the remainder of the day. That same day, B.W.A. withdrew from school.

After B.W.A. withdrew from Farmington High, parents and other community members began gathering across the street from the school, protesting and displaying a Confederate flag. Some students believed that these protests increased the racial tension inside of Farmington High. Students complained to the principal that they felt that the Confederate Flag was offensive and would lead to more disruptive behavior. Farmington High was also subjected to racial vandalism and property damage. These events resulted in the District permitting a black student to leave Farmington High because he was "uncomfortable due to the racial tension."

Approximately four months later, R.S. wore a shirt to school depicting an image of the Confederate flag and the words "The South was right[,] Our school is wrong." R.S. was suspended for the rest of the day for refusing to remove the shirt. The next day, R.S. wore a shirt to school with the slogan "Our school supports freedom of

---

[5]Specifically, the lyrics stated that "whites are superior, n*gg*rs are less;" "n*gg*rs will fall;" and "n*gg*rs faces will be a mess."

speech for all (except Southerners)." The assistant principal sent R.S. home to change the shirt, and R.S. complied. A couple of days later, S.B. wore a shirt to school containing the Confederate colors that said "Help Support B.[W.A.] Once a rebel, always and forever a rebel. We love B.[W.A.]" She was sent home after she refused to turn the shirt inside out.[6]

As a result of the suspensions, B.W.A. filed a claim under 42 U.S.C. § 1983, alleging that the District and its school officials[7] violated his First Amendment rights. Thereafter, B.W.A. amended his complaint by adding R.S. and S.B. as plaintiffs. They sought a declaratory judgment that they have a First Amendment right to wear the Confederate flag at school and an injunction prohibiting the District from banning the display of the Confederate flag. The District filed a motion for summary judgment, arguing that it had reason to believe that its display would cause a material and substantial disruption. The district court granted the District's summary judgment motion and dismissed the claims of B.W.A., R.S., and S.B.

## II. *Discussion*

On appeal, B.W.A. alleges that the district court improperly granted summary judgment. B.W.A primarily argues that the school district exercised impermissible viewpoint discrimination and did not establish a substantial risk of disruption based on display of the Confederate flag. B.W.A. also argues that the district court misinterpreted Missouri Revised Statute § 167.166.7 (2005).

---

[6]After the students were sent home, Farmington High was subjected to racial vandalism and property damage. Students complained to the principal that they felt the Confederate flag was offensive and would lead to more disruptive behavior.

[7]School officials include W.L. Sanders, Superintendent; Judith Delaney, Assistant Superintendent; Mark Krause, Teacher/Instructor; Susan Barber, Assistant Principal; and Todd McKinney, Dean of Students.

A. *Standard of Review*

We review a grant of summary judgment de novo. *Henerey v. City of St. Charles*, 200 F.3d 1128, 1131 (8th Cir. 1999). Summary judgment should be upheld if the evidence, viewed in the light most favorable to the nonmoving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(c).

B. *The* Tinker *Standard*

B.W.A., R.S. and S.B. argue that because the school did not show a concrete and substantial threat of disruption, its ban on the Confederate flag amounted to viewpoint discrimination in contravention of the First Amendment.

The First Amendment of the United States Constitution protects the free speech rights of students in school. But schools may legitimately restrict those rights in certain limited circumstances. In *Tinker v. Des Moines Independent School District*, the United States Supreme Court held that school administrators must demonstrate facts that might reasonably lead them "to forecast substantial disruption of or material interference with school activities" before prohibiting a particular expression of opinion. 393 U.S. 503, 514 (1969). In *Tinker,* the students were sent home and suspended from school for wearing black armbands to protest the Vietnam War. *Id.* at 504. The students filed a § 1983 claim alleging a violation of their First Amendment rights. *Id.* The Supreme Court held that because the armbands were not related in any way to actually or potentially disruptive conduct, the act of wearing the armbands constituted pure speech and, therefore, was protected by the First Amendment. *Id.* at 505–06. The Court stated as follows:

> In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that

-7-

engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained.

*Id.* at 509 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)). The *Tinker* Court concluded that the prohibition could not be sustained in the absence of a showing of material or substantial interference with school discipline. *Id.*

B.W.A., R.S. and S.B. rely on *Tinker* and its progeny, arguing that the District acted solely to suppress speech it deemed racially offensive. They contend that the District erroneously based its Confederate flag ban on incidents unrelated to the flag's display. *See Butts v. Dallas Indep. Sch. Dist.*, 436 F.2d 728, 732 (5th Cir. 1971) (stating that there must be some "establishment of substantial fact" before suppression of speech is allowed). Racially offensive speech cannot be restricted for that reason alone; but, when that speech occurs in an educational and social context that enables school officials to reasonably suspect material and substantial discipline disruption, some limitation of normal free expression is constitutionally permissible. Based on the substantial race-related events occurring both at the school and in the community, some of which involved the Confederate flag, we hold that the District's ban was constitutionally permissible. Farmington school officials, considering the instant facts and circumstances, could reasonably "forecast" a "substantial disruption" resulting from any display of the Confederate flag. *See Tinker*, 393 U.S. at 514.

Evidence of disruptions related to the Confederate flag or race include: (1) a skirmish between Farmington High and Festus High School after two Farmington High players allegedly used racial slurs against two black players from Festus in conjunction with a Confederate flag's display outside of the locker rooms; (2) a white student urinating on a black student, causing the black student to withdraw from the District; (3) a fight between a black student and white students at the black student's home, leading to a later confrontation at the school; (4) numerous racial slurs

occurring at the school; and (5) students drawing racially offensive symbols, such as swastikas, in their notebooks and on the chalkboard. These incidents provide substantial evidence of actual and potential disruptions likely related to the flag symbol.

*Tinker* and its progeny allow a school to "forecast" a disruption and take necessary precautions before racial tensions escalate out of hand. As a result of race-related incidents both in and out of the school, the administration reasonably denied the display of the Confederate flag within the school. Our holding is in line with our sister circuits that have addressed this issue. *See Scott v. Sch. Bd. of Alachua County.*, 324 F.3d 1246, 1248 (11th Cir. 2003) (holding that school officials may ban speech if they reasonably believe that speech is likely to "appreciably disrupt the appropriate discipline in the school"); *Melton v. Young*, 465 F.2d 1332 (6th Cir. 1972). In *Melton*, an all-white school nicknamed the "Rebels" displayed the Confederate flag as its school flag. *Melton*, 465 F.2d at 1333. After increased black enrollment, racial tensions erupted over the use of the Confederate flag, causing the administration to discontinue use of the nickname and flag. *Id*. Later, a student wore a jacket with the Confederate symbol emblazoned on the sleeve. *Id*. at 1334. The principal asked the student to remove the jacket or leave school because the principal felt the emblem could be "provocative." *Id*. The Sixth Circuit held that it was reasonable for the principal to ban the emblem based on the past racial tension at the school and the potential for reoccurrence. *Id*. As in *Melton*, Farmington school officials, based on evident racial tension, could reasonably ban the flag to prevent anticipated future disruptions.

Moreover, no other circuit has required the administration to wait for an actual disruption before acting. *See, e.g.*, *Barr v. Lafon*, 538 F.3d 554, 565 (6th Cir. 2008). In *Barr*, the Sixth Circuit held that *Tinker* does not require actual disruption based on the Confederate flag so long as the school could "reasonably forecast that the Confederate flag would cause substantial disruption to schoolwork and school

discipline." *Id*. at 565. Increasing racial tensions inside the school led administrators to ban the Confederate flag. *Id*. at 556–67. Based on conversations with students who viewed the flag as a racially divisive symbol, the principal believed that the flag "would be a source of confrontation and a symbol that would cause unrest with the student body." *Id*. at 560. On appeal, the aggrieved students argued that because there was no evidence "that the Confederate flag *ever* caused *any* disruption at the school," the ban was unconstitutional according to *Tinker*. *Id*. at 565. The Sixth Circuit disagreed, holding that the increasing racial tensions in the school made it reasonable for the administration to forecast disruptions based on the Confederate flag. *Id*. at 568; s*ee also West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366 (10th Cir. 2000) (holding that based on racial tension, school officials had reason to believe that display of the Confederate flag by a student "might cause disruption and interfere with the rights of other students to be secure and let alone").

Unquestionably, student speech is protected by the First Amendment. *See Tinker*, 393 U.S. at 506 (stating that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate"); *Lowry v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 759 (8th Cir. 2008) (same). But "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). School administrators are armed with more authority to circumscribe certain student speech if a ban would be necessary to avoid substantial disruptions. Contrary to B.W.A.'s assertion, viewpoint discrimination by school officials is not violative of the First Amendment if the *Tinker* standard requiring a reasonable forecast of substantial disruption or material interference is met. *Tinker*, 393 U.S. at 511 (stating that "the prohibition of expression of one particular opinion, *at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline*, is not constitutionally permissible") (emphasis added). Schools may not suppress speech merely "to avoid the discomfort and unpleasantness that always accompany an

unpopular viewpoint." *Tinker*, 393 U.S. at 509; *see generally Lowry*, 540 F.3d at 760 (holding that the students' First Amendment rights were violated because the school district punished their non-disruptive protest of the school's uniform policy). We believe that this case contains sufficient evidence beyond ordinary discomfort and unpleasantness of unpopular viewpoints. The record in this case contains evidence of likely racially-motivated violence, racial tension, and other altercations directly related to adverse race relations in the community and the school. *Tinker* is satisfied. Because the school could reasonably forecast a substantial disruption, the administration did not violate the First Amendment by banning the flag.

B.W.A., R.S. and S.B. rely on the Supreme Court's recent decision in *Morse v. Frederick*, 127 S. Ct. 2618 (2007). In *Morse*, the Supreme Court rejected a First Amendment claim and held that "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use." *Id*. at 2622. Joseph Frederick, a high school senior, was suspended for displaying a banner bearing the phrase "BONG HiTS 4 JESUS." *Id*. On appeal, the narrow question before the Supreme Court was "whether a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Id*. at 2625. After noting the prevalence of drug use among our nation's youth, the Court upheld the school's restriction of the banner because it could be "reasonably viewed as promoting illegal drug use." *Id*. at 2628–29. This narrow holding is inapposite to our case, and we, therefore, apply *Tinker*.

B.W.A., R.S. and S.B. characterize the case as one involving suppression of unpopular speech for its content alone. But this crops the full picture and distorts the situation confronting school officials. Here, in a school of 1,100 students, 15 to 20 minority students were subjected to racial tension from a white majority student and community population sufficient to motivate some to withdraw. This can hardly be considered an environment conducive to educational excellence. Racial tension can

devolve to violence suddenly. Schools may act proactively to prohibit race-related violence or even excessive racial tension that forces unnecessary departures of minority students from the school. Based on the evidence in the record, the school's ban on the flag was reasonably related to a substantial disruption, did not amount to viewpoint discrimination, and did not violate the First Amendment. Therefore, we affirm the district court's grant of summary judgment.

## C. *Missouri Strip Search Statute*

B.W.A., R.S. and S.B. also argue that the District violated Missouri Revised Statute § 167.166.7 because it discriminated against a student's viewpoint. B.W.A., R.S. and S.B. argue that the district court's interpretation of the statute "stripped [the statute] of its obvious intended protection of students' speech." We disagree and affirm.

The Missouri statute provides in relevant part:

> No employee of or volunteer in or school board member of or school district administrator of a public school or charter school shall direct a student to remove an emblem, insignia, or garment, including a religious emblem, insignia, or garment, as long as such emblem, insignia, or garment is worn in a manner that does not promote disruptive behavior.

Mo. Rev. Stat. § 167.166.7 (2005).

To date, no Missouri appellate court has addressed this statute. Therefore, we must determine how Missouri would interpret its law. *Lincoln Benefit Life Co. v. Edwards*, 243 F.3d 457, 465 (8th Cir. 2001) (holding that this court must decide what the state's highest court would do if faced with a question of state law). In Missouri, the primary rule of statutory construction is to "determine the legislature's intent by considering the plain and ordinary meaning of the words used in the statute and by giving each word, clause, sentence, and section of the statute meaning." *Neske v. City*

*of St. Louis*, 218 S.W.3d 417, 424 (Mo. 2007). When determining intent, courts are to look at the whole act and its purposes and avoid unreasonable, unjust, or absurd results. *State ex rel. Killingsworth v. George*, 168 S.W.3d 621, 623 (Mo. Ct. App. 2005).

The overarching statutory purpose is to expressly prohibit strip searches by school personnel except under supervision by authorized law enforcement officials unless a weapon or dangerous substance poses an imminent threat of physical harm. *See* Mo. Rev. Stat. § 167.166.2 (2005). The statute also forbids school personnel from removing not only garments but also emblems or insignias unless those items are worn in a manner to "promote disruptive behavior." Mo. Rev. Stat. § 167.166.7. Although the statute makes no mention of the First Amendment or free speech, it seems apparent that the statute is protective of students' right to wear apparel that also functions expressively. The district court determined that Farmington officials did not violate this section of the statute because the plain language of the statute allows school officials to direct a child to remove an emblem that is worn in a manner that promotes disruption. The prominent display of the Confederate flag emblem by B.W.A., in the school environment present at Farmington at the relevant time, could reasonably have been determined by school officials to have been done in a disruptive manner. B.W.A. admitted that he knew that some students would view the Confederate flag on his hat as a statement of racism and that he himself was a racist.

We agree with the district court that the school's actions did not contravene the Missouri strip search statute. We, therefore, affirm.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

-13-