*396 Chief Justice Roberts
delivered the opinion of the Court.
At a school-sanctioned and school-supervised event, a high school principal saw some of her students unfurl a large banner conveying a message she reasonably regarded as promoting illegal drug use. Consistent with established school policy prohibiting such messages at school events, the principal directed the students to take down the banner. One student — among those who had brought the banner to the event — refused to do so. The principal confiscated the banner and later suspended the student. The Ninth Circuit held that the principal’s actions violated the First Amendment, and that the student could sue the principal for damages.
Our cases make clear that students do not “shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.” Tinker v. Des Moines Independent Community School Dist., 393 U. S. 503, 506 (1969). At the same time, we have held that “the constitutional rights of students in public school are not automatically coextensive *397 with the rights of adults in other settings,” Bethel School Dist. No. 403 v. Fraser, 478 U. S. 675, 682 (1986), and that the rights of students “must be ‘applied in light of the special characteristics of the school environment,’” Hazelwood School Dist. v. Kuhlmeier, 484 U. S. 260, 266 (1988) (quoting Tinker, supra, at 506). Consistent with these principles, we hold that schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use. We conclude that the school officials in this ease did not violate the First Amendment by confiscating the pro-drug banner and suspending the student responsible for it.
I
On January 24, 2002, the Olympic Torch Relay passed through Juneau, Alaska, on its way to the winter games in Salt Lake City, Utah. The torchbearers were to proceed along a street in front of Juneau-Douglas High School (JDHS) while school was in session. Petitioner Deborah Morse, the school principal, decided to permit staff and students to participate in the Torch Relay as an approved social event or class trip. App. 22-23. Students were allowed to leave class to observe the relay from either side of the street. Teachers and administrative officials monitored the students’ actions.
Respondent Joseph Frederick, a JDHS senior, was late to school that day. When he arrived, he joined his friends (all but one of whom were JDHS students) across the street from the school to watch the event. Not all the students waited patiently. Some became rambunctious, throwing plastic cola bottles and snowballs and scuffling with their classmates. As the torchbearers and camera crews passed by, Frederick and his friends unfurled a 14-foot banner bearing the phrase: “BONG HiTS 4 JESUS.” App. to Pet. for Cert. 70a. The large banner was easily readable by the students on the other side of the street.
*398 Principal Morse immediately crossed the street and demanded that the banner be taken down. Everyone but Frederick complied. Morse confiscated the banner and told Frederick to report to her office, where she suspended him for 10 days. Morse later explained that she told Frederick to take the banner down because she thought it encouraged illegal drug use, in violation of established school policy. Juneau School Board Policy No. 5520 states: “The Board specifically prohibits any assembly or public expression that . . . advocates the use of substances that are illegal to minors----” Id., at 53a. In addition, Juneau School Board Policy No. 5850 subjects “[p]upils who participate in approved social events and class trips” to the same student conduct rules that apply during the regular school program. Id., at 58a.
Frederick administratively appealed his suspension, but the Juneau School District Superintendent upheld it, limiting it to time served (eight days). In a memorandum setting forth his reasons, the superintendent determined that Frederick had displayed his banner “in the midst of his fellow students, during school hours, at a school-sanctioned activity.” Id., at 63a. He further explained that Frederick “was not disciplined because the principal of the school ‘disagreed’ with his message, but because his speech appeared to advocate the use of illegal drugs.” Id., at 61a.
The superintendent continued:
“The common-sense understanding of the phrase ‘bong hits’ is that it is a reference to a means of smoking marijuana. Given [Frederick’s] inability or unwillingness to express any other credible meaning for the phrase, I can only agree with the principal and countless others who saw the banner as advocating the use of illegal drugs. [Frederick’s] speech was not political. He was not advocating the legalization of marijuana or promoting a religious belief. He was displaying a fairly silly message promoting illegal drug usage in the midst *399 of a school activity, for the benefit of television cameras covering the Torch Relay. [Frederick’s] speech was potentially disruptive to the event and clearly disruptive of and inconsistent with the school’s educational mission to educate students about the dangers of illegal drugs and to discourage their use.” Id., at 61a-62a.
Relying on our decision in Fraser, supra, the superintendent concluded that the principal’s actions were permissible because Frederick’s banner was “speech or action that intrudes upon the work of the schools.” App. to Pet. for Cert. 62a (internal quotation marks omitted). The Juneau School District Board of Education upheld the suspension.
Frederick then filed suit under 42 U. S. C. § 1983, alleging that the school board and Morse had violated his First Amendment rights. He sought declaratory and injunctive relief, unspecified compensatory damages, punitive damages, and attorney’s fees. The District Court granted summary judgment for the school board and Morse, ruling that they were entitled to qualified immunity and that they had not infringed Frederick’s First Amendment rights. The court found that Morse reasonably interpreted the banner as promoting illegal drug use — a message that “directly contravened the Board’s policies relating to drug abuse prevention.” App. to Pet. for Cert. 36a-38a. Under the circumstances, the court held that “Morse had the authority, if not the obligation, to stop such messages at a school-sanctioned activity.” Id., at 37a.
The Ninth Circuit reversed. Deciding that Frederick acted during a “school-authorized activity],” and “proceeding] on the basis that the banner expressed a positive sentiment about marijuana use,” the court nonetheless found a violation of Frederick’s First Amendment rights because the school punished Frederick without demonstrating that his speech gave rise to a “risk of substantial disruption.” 439 F. 3d 1114, 1118, 1121-1123 (2006). The court further concluded that Frederick’s right to display his banner was *400 so “clearly established” that a reasonable principal in Morse’s position would have understood that her actions were unconstitutional, and that Morse was therefore not entitled to qualified immunity. Id., at 1123-1125.
We granted certiorari on two questions: whether Frederick had a First Amendment right to wield his banner, and, if so, whether that right was so clearly established that the principal may be held liable for damages. 549 U. S. 1075 (2006). We resolve the first question against Frederick, and therefore have no occasion to reach the second.[1]
II
At the outset, we reject Frederick’s argument that this is not a school speech case — as has every other authority to address the question. See App. 22-23 (Principal Morse); App. to Pet. for Cert. 63a (superintendent); id., at 69a (school board); id., at 34a-35a (District Court); 439 F. 3d, at 1117 (Ninth Circuit). The event occurred during normal school hours. It was sanctioned by Principal Morse “as an approved social event or class trip,” App. 22-23, and the school district’s rules expressly provide that pupils in “approved social events and class trips are subject to district rules for *401 student conduct,” App. to Pet. for Cert. 58a. Teachers and administrators were interspersed among the students and charged with supervising them. The high school band and cheerleaders performed. Frederick, standing among other JDHS students across the street from the school, directed his banner toward the school, making it plainly visible to most students. Under these circumstances, we agree with the superintendent that Frederick cannot “stand in the midst of his fellow students, during school hours, at a school-sanctioned activity and claim he is not at school.” Id., at 63a. There is some uncertainty at the outer boundaries as to when courts should apply school speech precedents, see Porter v. Ascension Parish School Bd., 393 F. 3d 608, 615, n. 22 (CA5 2004), but not on these facts.
Ill
The message on Frederick’s banner is cryptic. It is no doubt offensive to some, perhaps amusing to others. To still others, it probably means nothing at all. Frederick himself claimed “that the words were just nonsense meant to attract television cameras.” 439 F. 3d, at 1117-1118. But Principal Morse thought the banner would be interpreted by those viewing it as promoting illegal drug use, and that interpretation is plainly a reasonable one.
As Morse later explained in a declaration, when she saw the sign, she thought that “the reference to a ‘bong hit’ would be widely understood by high school students and others as referring to smoking marijuana.” App. 24. She further believed that “display of the banner would be construed by students, District personnel, parents and others witnessing the display of the banner, as advocating or promoting illegal drug use” — in violation of school policy. Id., at 25; see ibid. (“I told Frederick and the other members of his group to put the banner down because I felt that it violated the [school] policy against displaying. .. material that advertises or promotes use of illegal drugs”).
*402 We agree with Morse. At least two interpretations of the words on the banner demonstrate that the sign advocated the use of illegal drugs. First, the phrase could be interpreted as an imperative: “[Take] bong hits ... ” — a message equivalent, as Morse explained in her declaration, to “smoke marijuana” or “use an illegal drug.” Alternatively, the phrase could be viewed as celebrating drug use — “bong hits [are a good thing],” or “[we take] bong hits” — and we discern no meaningful distinction between celebrating illegal drug use in the midst of fellow students and outright advocacy or promotion. See Guiles v. Marineau, 461 F. 3d 320, 328 (CA2 2006) (discussing the present case and describing the sign as “a clearly pro-drug banner”).
The pro-drug interpretation of the banner gains further plausibility given the paucity of alternative meanings the banner might bear. The best Frederick can come up with is that the banner is “meaningless and funny.” 439 F. 3d, at 1116. The dissent similarly refers to the sign’s message as “curious,” post, at 434 (opinion of Stevens, J.), “ambiguous,” ibid., “nonsense,” post, at 435, “ridiculous,” post, at 438, “obscure,” post, at 439, “silly,” post, at 444, “quixotic,” post, at 445, and “stupid,” ibid. Gibberish is surely a possible interpretation of the words on the banner, but it is not the only one, and dismissing the banner as meaningless ignores its undeniable reference to illegal drugs.
The dissent mentions Frederick’s “credible and uncontradicted explanation for the message — he just wanted to get on television.” Post, at 444. But that is a description of Frederick’s motive for displaying the banner; it is not an interpretation of what the banner says. The way Frederick was going to fulfill his ambition of appearing on television was by unfurling a pro-drug banner at a school event, in the presence of teachers and fellow students.
Elsewhere in its opinion, the dissent emphasizes the importance of political speech and the need to foster “national debate about a serious issue,” post, at 448, as if to suggest *403 that the banner is political speech. But not even Frederick argues that the banner conveys any sort of political or religious message. Contrary to the dissent’s suggestion, see post, at 446-448, this is plainly not a case about political debate over the criminalization of drug use or possession.
IV
The question thus becomes whether a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use. We hold that she may.
In Tinker, this Court made clear that “First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students.” 393 U. S., at 506. Tinker involved a group of high school students who decided to wear black armbands to protest the Vietnam War. School officials learned of the plan and then adopted a policy prohibiting students from wearing armbands. When several students nonetheless wore armbands to school, they were suspended. Id., at 504. The students sued, claiming that their First Amendment rights had been violated, and this Court agreed.
Tinker held that student expression may not be suppressed unless school officials reasonably conclude that it will “materially and substantially disrupt the work and discipline of the school.” Id., at 513. The essential facts of Tinker are quite stark, implicating concerns at the heart of the First Amendment. The students sought to engage in political speech, using the armbands to express their “disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them.” Id., at 514. Political speech, of course, is “at the core of what the First Amendment is designed to protect.” Virginia v. Black, 538 U. S. 343, 365 (2003) (plurality opinion). The only interest the Court discerned underlying the school’s actions was the “mere desire to avoid *404 the discomfort and unpleasantness that always accompany an unpopular viewpoint,” or “an urgent wish to avoid the controversy which might result from the expression.” Tinker, 393 U. S., at 509, 510. That interest was not enough to justify banning “a silent, passive expression of opinion, unaccompanied by any disorder or disturbance.” Id., at 508.
This Court’s next student speech case was Fraser, 478 U. S. 675. Matthew Fraser was suspended for delivering a speech before a high school assembly in which he employed what this Court called “an elaborate, graphic, and explicit sexual metaphor.” Id., at 678. Analyzing the case under Tinker, the District Court and Court of Appeals found no disruption, and therefore no basis for disciplining Fraser. 478 U. S., at 679-680. This Court reversed, holding that the “School District acted entirely within its permissible authority in imposing sanctions upon Fraser in response to his offensively lewd and indecent speech.” Id., at 685.
The mode of analysis employed in Fraser is not- entirely clear. The Court was plainly attuned to the content of Fraser’s speech, citing the “marked distinction between the political ‘message’ of the armbands in Tinker and the sexual content of [Fraser’s] speech.” Id., at 680. But the Court also reasoned that school boards have the authority to determine “what manner of speech in the classroom or in school assembly is inappropriate.” Id., at 683. Cf. id., at 689 (Brennan, J., concurring in judgment) (“In the present case, school officials sought only to ensure that a high school assembly proceed in an orderly manner. There is no suggestion that school officials attempted to regulate [Fraser’s] speech because they disagreed with the views he sought to express”).
We need not resolve this debate to decide this case. For present purposes, it is enough to distill from Fraser two basic principles. First, Fraser’s holding demonstrates that “the constitutional rights of students in public school are not automatically coextensive with the rights , of adults in other *405 settings.” Id., at 682. Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected. See Cohen v. California, 403 U. S. 15 (1971); Fraser, supra, at 682-683. In school, however, Fraser’s First Amendment rights were circumscribed “in light of the special characteristics of the school environment.” Tinker, supra, at 506. Second, Fraser established that the mode of analysis set forth in Tinker is not absolute. Whatever approach Fraser employed, it certainly did not conduct the “substantial disruption” analysis prescribed by Tinker, supra, at 514. See Kuhlmeier, 484 U. S., at 271, n. 4 (disagreeing with the proposition that there is “no difference between the First Amendment analysis applied in Tinker and that applied in Fraser,” and noting that the holding in Fraser was not based on any showing of substantial disruption).
Our most recent student speech case, Kuhlmeier, concerned “expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.” 484 U. S., at 271. Staff members of a high school newspaper sued their school when it chose not to publish two of their articles. The Court of Appeals analyzed the case under Tinker, ruling in favor of the students because it found no evidence of material disruption to classwork or school discipline. Kuhlmeier v. Hazelwood School Dist., 795 F. 2d 1368, 1375 (CA8 1986). This Court reversed, holding that “educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.” Kuhlmeier, 484 U. S., at 273.
Kuhlmeier does not control this case because no one would reasonably believe that Frederick’s banner bore the school’s imprimatur. The case is nevertheless instructive because it confirms both principles cited above. Kuhlmeier acknowl *406 edged that schools may regulate some speech “even though the government could not censor similar speech outside the school.” Id., at 266. And, like Fraser, it confirms that the rule of Tinker is not the only basis for restricting student speech.[2]
Drawing on the principles applied in our student speech cases, we have held in the Fourth Amendment context that “while children assuredly do not ‘shed their constitutional rights ... at the schoolhouse gate,’ ... the nature of those rights is what is appropriate for children in school.” Vernonia School Dist. 47J v. Acton, 515 U. S. 646, 655-656 (1995) (quoting Tinker, supra, at 506). In particular, “the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject.” New Jersey v. T. L. O., 469 U. S. 325, 340 (1985). See Vernonia, supra, at 656 (“Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere ... ”); Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U. S. 822, 829-830 (2002) (“ ‘special needs’ inhere in the public school context”; “[wjhile schoolchildren do not shed their constitutional rights when they enter the schoolhouse, Fourth Amendment rights ... are different in public schools than elsewhere; the ‘reasonableness’ inquiry cannot disregard the schools’ custodial and tutelary responsibility for children” (quoting Vernonia, 515 U. S., at 656; citation and some internal quotation marks omitted)).
*407 Even more to the point, these cases also recognize that deterring drug use by schoolchildren is an “important— indeed, perhaps compelling” interest. Id., at 661. Drug abuse can cause severe and permanent damage to the health and well-being of young people:
“School years are the time when the physical, psychological, and addictive effects of drugs are most severe. Maturing nervous systems are more critically impaired by intoxicants than mature ones are; childhood losses in learning are lifelong and profound; children grow chemically dependent more quickly than adults, and their record of recovery is depressingly poor. And of course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted.” Id., at 661-662 (citations and internal quotation marks omitted).
Just five years ago, we wrote: “The drug abuse problem among our Nation’s youth has hardly abated since Vernonia was decided in 1995. In fact, evidence suggests that it has only grown worse.” Earls, supra, at 834, and n. 5.
The problem remains serious today. See generally 1 National Institute on Drug Abuse, National Institutes of Health, Monitoring the Future: National Survey Results on Drug Use, 1975-2005, Secondary School Students (2006). About half of American 12th graders have used an illicit drug, as have more than a third of 10th graders and about one-fifth of 8th graders. Id., at 99. Nearly one in four 12th graders has used an illicit drug in the past month. Id., at 101. Some 25% of high schoolers say that they have been offered, sold, or given an illegal drug on school property within the past year. Dept, of Health and Human Services, Centers for Disease Control and Prevention, Youth Risk Behavior Surveillance — United States, 2005, 55 Morbidity and Mortality Weekly Report, Surveillance Summaries, No. SS-5, p. 19 (June 9, 2006).
*408 Congress has declared that part of a school’s job is educating students about the dangers of illegal drug use. It has provided billions of dollars to support state and local drug-prevention programs, Brief for United States as Amicus Curiae 1, and required that schools receiving federal funds under the Safe and Drug-Free Schools and Communities Act of 1994 certify that their drug-prevention programs “convey a clear and consistent message that ... the illegal use of drugs [is] wrong and harmful,” 20 U. S. C. § 7114(d)(6) (2000 ed., Supp. IV).
Thousands of school boards throughout the country — including JDHS — have adopted policies aimed at effectuating this message. See Pet. for Cert. 17-21. Those school boards know that peer pressure is perhaps “the single most important factor leading schoolchildren to take drugs,” and that students are more likely to use drugs when the norms in school appear to tolerate such behavior. Earls, supra, at 840 (Breyer, J., concurring). Student speech celebrating illegal drug use at a school event, in the presence of school administrators and teachers, thus poses a particular challenge for school officials working to protect those entrusted to their care from the dangers of drug abuse.
The “special characteristics of the school environment,” Tinker, 393 U. S., at 506, and the governmental interest in stopping student drug abuse — reflected in the policies of Congress and myriad school boards, including JDHS — allow schools to restrict student expression that they reasonably regard as promoting illegal drug use. Tinker warned that schools may not prohibit student speech because of “undifferentiated fear or apprehension of disturbance” or “a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.” Id., at 508, 509. The danger here is far more serious and palpable. The particular concern to prevent student drug abuse at issue here, embodied in established school policy, App. 92-95; App. to Pet. *409 for Cert. 53a, extends well beyond an abstract desire to avoid controversy.
Petitioners urge us to adopt the broader rule that Frederick’s speech is proseribable because it is plainly “offensive” as that term is used in Fraser. See Reply Brief for Petitioners 14-15. We think this stretches Fraser too far; that case should not be read to encompass any speech that could fit under some definition of “offensive.” After all, much political and religious speech might be perceived as offensive to some. The concern here is not that Frederick’s speech was offensive, but that it was reasonably viewed as promoting illegal drug use.
Although accusing this decision of doing “serious violence to the First Amendment” by authorizing “viewpoint discrimination,” post, at 435, 437, the dissent concludes that “it might well be appropriate to tolerate some targeted viewpoint discrimination in this unique setting,” post, at 439. Nor do we understand the dissent to take the position that schools are required to tolerate student advocacy of illegal drug use at school events, even if that advocacy falls short of inviting “imminent” lawless action. See ibid. (“[I]t is possible that our rigid imminence requirement ought to be relaxed at schools”). And even the dissent recognizes that the issues here are close enough that the principal should not be held liable in damages, but should instead enjoy qualified immunity for her actions. See post, at 434. Stripped of rhetorical flourishes, then, the debate between the dissent and this opinion is less about constitutional first principles than about whether Frederick’s banner constitutes promotion of illegal drug use. We have explained our view that it does. The dissent’s contrary view on that relatively narrow question hardly justifies sounding the First Amendment bugle.
* * *
School principals have a difficult job, and a vitally important one. When Frederick suddenly and unexpectedly un *410 furled his banner, Morse, had to decide to act — or not act— on the spot. It was reasonable for her to conclude that the banner promoted illegal drug use — in violation of established school policy — and that failing to act would send a powerful message to the students in her charge, including Frederick, about how serious the school was about the dangers of illegal drug use. The First Amendment does not require schools to tolerate at school events student expression that contributes to those dangers.
The judgment of the United States Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 Justice Breyer would rest decision on qualified immunity without reaching the underlying First Amendment question. The problem with this approach is the rather significant one that it is inadequate to decide the case before us. Qualified immunity shields public officials from money damages only. See Wood v. Strickland, 420 U. S. 308, 314, n. 6 (1975). In this case, Frederick asked not just for damages, but also for declaratory and injunctive relief. App. 13. Justice Breyer’s proposed decision on qualified immunity grounds would dispose of the damages claims, but Frederick’s other claims would remain unaddressed. To get around that problem, Justice Breyer hypothesizes that Frederick’s suspension — the target of his request for injunctive relief — “may well be justified on non-speech-related grounds.” See post, at 433 (opinion concurring in judgment in part and dissenting in part). That hypothesis was never considered by the courts below, never raised by any of the parties, and is belied by the record, which nowhere suggests that the suspension would have been justified solely on non-speech-related grounds.

 The dissent’s effort to find inconsistency between our approach here and the opinion in Federal Election Comm’n v. Wisconsin Right to Life, Inc., post, p. 449, see post, at 444-445, overlooks what was made clear in Tinker, Fraser, and Kuhlmeier. Student First Amendment rights are “applied in light of the special characteristics of the school environment.” Tinker, 393 U. S., at 506. See Fraser, 478 U. S., at 682; Kuhlmeier, 484 U. S., at 266. And, as discussed above, supra, at 402-403, there is no serious argument that Frederick’s banner is political speech of the sort at issue in Wisconsin Right to Life.