ROGERS, Circuit Judge,
concurring.[1]
A public high school that can put reasonable limits on drug-related speech by students can put reasonable and even-handed limits on racially hostile or contemptuous speech, without having to show that such speech will result in disturbances. Expressions of racial hostility can be controlled in the public schools even if students in the attacked racial group happen to be mature, good-natured, and slow to react. Schools are places of learning and not cauldrons for racial conflict. Moreover, expression of racial hostility can be controlled in the public schools even though such expressions are constitutionally permitted in newspapers, public parks, and on the street. Public school students cannot simply decide not to go to school.
What amounts to racially hostile speech has to be determined in the first instance by school administrators. Students cannot attack such limits on the ground that their racially hostile speech was not intended to be hostile if the speech will clearly be taken as racially hostile, and schools must be able to draw some reasonably clear and understandable lines. Such limits are subject to attack in court only if a school’s limits are not even-handed or if the school’s limits are akin to the ban on antiwar armbands during the Vietnam War— expressions of dissent that are banned in essence because the administration disagrees with them.
*339 Because these principles are firmly grounded in a fair reading of the key Supreme Court precedents dealing with school speech, it is not necessary in this case for the defendant schools to show that altercations or disruptions will occur if students are not allowed to wear clothes with Confederate flags on them.
The Supreme Court’s recent decision in Morse v. Frederick, 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), provides strong support for these conclusions. The Court in that case upheld discipline of a student for displaying — at a school activity — a banner that, albeit ambiguous, could easily be read to support drug use. The Court did not base this holding on any showing or reasonable forecast that allowing students to advocate drug use might cause “material or substantial disruption” in the parties’ school. Rather, the Court deferred to the policy judgment of the school board that “deterring drug use by schoolchildren is an important — indeed, perhaps compelling interest.” Id. at 407, 127 S.Ct. 2618. Instead of reviewing the school’s history (assuming there even was one) of disruptive events brought about by drug advocacy, the Court gave the school administrators discretion to combat the serious national problem of drug abuse in the way they chose — by banning its advocacy: “The special characteristics of the school environment and the governmental interest in stopping student drug abuse— reflected in the policies of Congress and myriad school boards, including JDHS— allow schools to restrict student expression that they reasonably regard as promoting illegal drug use.” Id. at 408, 127 S.Ct. 2618. If we substitute “racial conflict” or “racial hostility” for “drug abuse,” the analysis in Morse is practically on all fours with this case. The inescapable conclusion is that a school may restrict racially hostile or contemptuous speech in school, when school administrators reasonably view the speech as racially hostile or promoting racial conflict.
A dress code that bans such displays— including displays of symbols to the same effect — could thus permissibly ban displays of the Confederate flag. The Confederate battle flag, it is true, may convey a noble message, for instance to signify honor for one’s ancestors who fought bravely with their state compatriots for independence from the industrial North. But the Confederate flag on a T-shirt is doubtless perceived by many, if not most, student viewers in today’s high schools in the United States as a statement of racial hostility — comparable to a slogan that says “Blacks should be slaves” or “Blacks are inferior.” See Scott v. Sch. Bd. of Alachua County, 324 F.3d 1246, 1248-49 (11th Cir.2003). The reader who somehow doubts this must at least concede that reasonable school administrators could reasonably so conclude. The Supreme Court reasoned similarly in Morse, which involved a banner stating “BONG HiTS 4 JESUS.” The Court recognized that the banner could be read as advocating drug use, or as “celebrating” drug use, or as silly nonsense. Morse, 551 U.S. at 402, 127 S.Ct. 2618. Nonetheless, because the school principal could read the banner as advocating drug use, the principal could suspend the student where the principal’s interpretation was “plainly a reasonable one.” Id. at 401, 127 S.Ct. 2618. A plainly reasonable interpretation of a Confederate flag T-shirt or jacket is one of racial hostility or contempt, regardless of the subjective intent of the wearer. And even if the individual student meant no such hostility or contempt, a school administrator cannot practically administer a rule that permits such clothing sometimes and prohibits it other times, depending on the intent of each individual wearer.
*340 Morse furthermore distilled two basic principles — applicable to school speech cases in general — from the Court’s earlier decisions in Tinker v. Des Moines Independent School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and Bethel School District No. 103 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). First, “the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings.” Morse, 551 U.S. at 404-05, 127 S.Ct. 2618 (quoting Fraser, 478 U.S. at 682, 106 S.Ct. 3159). Thus drug use may be advocated on the streets and in the public square, but not in the public schools. Similarly, racial contempt can be advocated on the streets and in the public square, but not necessarily in the public schools. The Supreme Court in Morse reiterated the special nature of the school setting: “the nature of [constitutional] rights is what is appropriate for children in school” and constitutional rights “are different in public schools than elsewhere; the ‘reasonableness’ inquiry cannot disregard the schools’ custodial and tutelary responsibility for children.” Id. at 406, 127 S.Ct. 2618 (quoting Vemonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 656, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)).
Just as the Supreme Court went on to recognize an “important, perhaps compelling” interest in deterring drug use in the schools, there is of course a comparably “important, perhaps compelling” interest in reducing racial tension in the public schools. Racial tension obviously interferes with learning in ways that even strongly-held political views do not. Anger, hostility, and contempt are not elements of a sound learning strategy, or school administrators could at least so conclude. In addition, students do not generally attend public schools by choice — they have to be there. They cannot avoid racially demeaning slogans and symbols by staying elsewhere; they can only rely on school administrators to create a learning environment clear of racial hostility or contempt.
The second basic principle derived by the Morse Court from Tinker and Fraser is that “the mode of analysis set forth in Tinker is not absolute.” Morse, 551 U.S. at 405, 127 S.Ct. 2618. In other words, although the Tinker Court held unconstitutional a school ban on anti-Vietnam War armbands where the school had not shown that “substantial disruption” would occur at the school, a “substantial disruption” requirement does not always apply to school speech cases. Just as in Morse, Tinker is distinguishable from this case. Tinker involved a school administration that disagreed with the anti-war message of the armband, and sought to justify a ban based on the mere possibility of disruption. Just as the danger of drug use is “far more serious and palpable” than the flimsy rationale put forward in Tinker, Morse, 551 U.S. at 408, 127 S.Ct. 2618, the danger of racial hostility and mutual student contempt is also “far more serious and palpable” than the pretext in Tinker. To keep students from wearing racially hostile slogans or symbols obviously reflects a “particular concern ... [that] extends well beyond an abstract desire to avoid controversy.” Id. at 408-09, 127 S.Ct. 2618.
A fair reading of Morse, then, in connection with a recognition that racial tension in today’s public schools is a concern on the order of the problem of drug abuse, leads to the conclusion that a dress code that forbids racially hostile slogans and symbols — if fairly applied — comports with the First Amendment even without a so-called Tinker showing of a reasonable forecast of substantial disruption. For this reason, affirmance is required in this case. It is clear that no Tinker showing was *341 required in Morse, and such a showing is not required in this case.
It might be possible for us to uphold the school’s policy in this case by finding a sufficient threat of the “substantial disruption” required in Tinker, as we did in Barr v. Lafon, 538 F.3d 554 (6th Cir.2008). Two concerns counsel against such a course. First, the evidence of potential disruption in Barr was more consistent and compelling than in this case. While there have been troublesome racial incidents in the Anderson County schools in the past, there was also some testimony to the effect that the wearing of a Confederate flag would not cause disruption.[2] For us to uphold a summary judgment in favor of the school board, there must be no genuine issue of material fact. If the school must after all show a reasonable forecast of “substantial disruption,” then it is at least questionable whether summary judgment for the school was appropriate. Second, because the law does not require a Tinker showing of a reasonable forecast of “substantial disruption” in the context of this case, it would be a waste to have a trial to determine whether there is such a threat. In general, moreover, it would be a waste for school boards to have to find instances of racial altercations in order to justify a dress-code ban on racially hostile slogans and symbols. On the other hand, it would be illogical to require school administrators to allow racially hostile or contemptuous slogans and symbols just because those who are demeaned or insulted are responsible, mature, or slow to anger.
It is true that in Barr we stated that, while a school may categorically prohibit vulgar or lewd speech under Fraser, and censor school-sponsored student speech under Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), “the Tinker standard applies to all other student speech.” Barr, 538 F.3d at 564. Because in Barr we found that the Tinker standard was met, this statement was not necessary to our decision in Barr. Moreover, the sweeping statement is not consistent with the Supreme Court’s then-recent decision in Morse, since the speech in Morse fell in neither exception and Tinker was not applied.[3]
The Barr opinion does refer to Morse, but reads Morse as categorically limited to speech promoting illegal drug use. Barr, 538 F.3d at 564. But it is not at all clear that Tinker must be read as providing the general rule for all student speech, limited only by subsequent categorical “exceptions” to that general rule. Morse actually suggests the opposite: “the mode of analy *342 sis set forth in Tinker is not absolute.” Morse, 551 U.S. at 405, 127 S.Ct. 2618.
Morse thus makes clear that Fraser is not just an exception narrowly limited to lewd speech, but has more general applicability. Fraser explained that public schools have the duty to promote the “fundamental values necessary to the maintenance of a democratic political system,” and explicitly recognized that such values “must also take into account consideration of the sensibilities of others, and, in the case of a school, the sensibilities of fellow students.” Fraser, 478 U.S. at 681, 106 S.Ct. 3159 (emphasis added). Given the widespread perception of the Confederate flag as a symbol of white superiority, schools could easily view wearing one to be at least as damaging to student sensibilities as Matthew Fraser’s speech “glorifying male sexuality.” Id. at 683, 106 S.Ct. 3159. In upholding Fraser’s suspension, the Court made the schools’ supervisory role very clear: “The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech or conduct such as that indulged in by this confused boy.” Id. Morse confirmed that such determinations do not require Tinker-style “substantial disruption” showings. The Court in Morse explicitly stated that “[wjhatever approach Fraser employed, it certainly did not conduct the ‘substantial disruption’ analysis prescribed by Tinker.” 551 U.S. at 405, 127 S.Ct. 2618.
A fair look at Tinker, Fraser, Hazel-wood, and Morse thus suggests that the general rule is that school administrators can limit speech in a reasonable fashion to further important policies at the heart of public education. Tinker provides the exception — schools cannot go so far as to limit nondisruptive discussion of political or social issues that the administration finds distasteful or wrong. Drawing such a line may be difficult, but it must be left as a practical matter first to school administrators, with resort to the courts always available for cases like Tinker where the school goes too far. The present case is clearly different from Tinker.
These reasons warrant our affirmance of the judgment of the district court.

. COOK, J., joins this opinion.

. See, e.g., R. 50-5, Depo. Landrum at 22 (Q: "But you said that last year, it wouldn't have been likely to cause a disruption in your class?” A: "Probably not.”); R. 50-6, Depo. Anderson at 11 (Q: "Would you say that Tom's display of the confederate flag would be likely to cause a disruption in your class?” A: “In my class, no.”); id. at 12 (Q: "Knowing what you know about the school, is Tom's display of the confederate flag in that school likely to cause a disruption?” A: “Not in that school.”); R. 50-12, Depo. Deal at 32-33 (Q: "[Wjould you expect a disruption to occur in the school because of the confederate flag’s presence?” ... A: "Probably not.”); R. 50-13, Depo. Stonecipher at 25-26 (Q: “Would you say that if the confederate flag was allowed in the school tomorrow, in Clinton High School, do you think it would be likely to cause a disruption?” ... A: "More than likely.” Q: "Okay. Would you say that’s true of every school in the District?” ... A: "No, sir.” Q: "What schools do you think it wouldn't cause a problem in?” ... A: "It wouldn’t cause a problem in those schools that have zero minority population.”).

. Castorina v. Madison County School Board, 246 F.3d 536, 541-44 (6th Cir.2001), contains some similar reasoning to the statement in Barr, but Castorina preceded the Supreme Court’s decision in Morse.