SMITH, Circuit Judge,
concurring, with whom McKEE, Chief Judge, SLOVITER, FUENTES, and HARDIMAN, Circuit Judges, join.
Because the school district suspended J.S. for speech that she engaged in at home on a Sunday evening, I fully agree with the majority’s conclusion that it violated J.S.’s First Amendment rights. I write separately to address a question that the majority opinion expressly leaves open: whether Tinker applies to off-campus speech in the first place. I would hold that it does not, and that the First Amendment protects students engaging in off-campus speech to the same extent it protects speech by citizens in the community at large.
As a general matter, the First Amendment strictly protects speech regardless of whether it is disruptive, offensive, vulgar, or insulting. See Texas v. Johnson, 491 U.S. 397, 408-10, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); Hustler Magazine v. Falwell, 485 U.S. 46, 54-57, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); Cohen v. California, 403 U.S. 15, 25-26, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). In Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 *937 L.Edüd 731 (1969), the Supreme Court considered whether different rules should govern student speech inside public schools. Although it observed that students do not “shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,” the Court determined that, “in light of the special characteristics of the school environment” and the need to defer to school officials’ authority “to prescribe and control conduct in the schools,” the First Amendment’s ordinarily strict protection of speech rights should be relaxed in the public-school context. Id. at 506-08, 89 S.Ct. 733. The Court thus concluded that some otherwise-protected speech can be suppressed in the school setting, but only if it “would materially and substantially disrupt the work and discipline of the school.” Id. at 513, 89 S.Ct. 733.
In later cases, the Court recognized exceptions to Tinker, holding that even non-disruptive school speech can be restricted if it is lewd or vulgar, Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 685, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), if it is school-sponsored and the restriction is “reasonably related to legitimate pedagogical concerns,” Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), or if it is reasonably viewed as promoting the use of illegal drugs, Morse v. Frederick, 551 U.S. 393, 403, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007).
Courts agree that Fraser, Kuhlmeier, and Morse apply solely to on-campus speech (I use the phrase “on-campus speech” as shorthand for speech communicated at school or, though not on school grounds, at a school-sanctioned event, see Morse, 551 U.S. at 400-01, 127 S.Ct. 2618). Indeed, the Supreme Court has expressly recognized that Fraser does not extend “outside the school context,” id. at 405,127 S.Ct. 2618 (citing Cohen), and three justices have observed (without objection from the other six) that speech promoting illegal drug use, even if prescribable in a public school, would “unquestionably” be protected if uttered elsewhere, id. at 434, 127 S.Ct. 2618 (Stevens, J., joined by Souter and Ginsburg, JJ., dissenting). Lower courts, however, are divided on whether Tinker*s substantial-disruption test governs students’ off-campus expression. Compare Porter v. Ascension Parish Sch. Bd., 393 F.3d 608, 615, 620 (5th Cir.2004) {Tinker does not apply to students’ off-campus speech), Thomas v. Bd. of Educ., Granville Cent. Sch. Dist., 607 F.2d 1043, 1050, 1053 n. 18 (2d Cir.1979) (distinguishing Tinker in a case involving off-campus expression), and Klein v. Smith, 635 F.Supp. 1440, 1441 (D.Me.1986), with Wisniewski v. Bd. of Educ. of the Weedsport Cent. Sch. Dist., 494 F.3d 34, 39 & n. 4 (2d Cir.2007) {Tinker applies to off-campus speech in certain circumstances), J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist., 711 F.Supp.2d 1094, 1104, 1107 (C.D.Cal.2010) (same), and Killion v. Franklin Reg’l Sch. Dist., 136 F.Supp.2d 446, 454-55 (W.D.Pa.2001). In my view, the decisions holding that Tinker does not apply to off-campus speech have the better of the argument.
Tinker’s holding is expressly grounded in “the special characteristics of the school environment,” 393 U.S. at 506, 89 S.Ct. 733, and the need to defer to school officials’ authority “to prescribe and control conduct in the schools,” id. at 507, 89 S.Ct. 733.[1] The Court’s later school-speech *938 cases underscored Tinker’s narrow reach. Tinker, according to the Court’s decision in Fraser, rests on the understanding that “the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings,” see 478 U.S. at 682, 106 S.Ct. 3159, and that students are a captive audience while at school, see id. at 684, 106 S.Ct. 3159. See also id. at 688 n. 1, 106 S.Ct. 3159 (Brennan, J., concurring in judgment) (stating that the Court’s school-speech cases “obviously do not [apply] outside of the school environment”). Kuhlmeier, moreover, described Tinker as “addressing] educators’ ability to silence a student’s personal expression that happens to occur on the school premises.” 484 U.S. at 271, 108 S.Ct. 562. Finally, in Morse, the Court took care to refute the contention that the plaintiffs speech, which took place at a school field trip, did not occur “at school.” 551 U.S. at 401, 127 S.Ct. 2618. In concluding that the plaintiffs suit was governed by the Tinker line of cases, the Court stressed that the field trip “occurred during normal school hours,” that it “was sanctioned by [the principal] as an approved social event or class trip,” that “[t]eachers and administrators were interspersed among the students and charged with supervising them,” and that the “high school band and cheerleaders performed.” Id. at 400-01, 127 S.Ct. 2618. If Tinker and the Court’s other school-speech precedents applied to off-campus speech, this discussion would have been unnecessary. See also id. at 406, 127 S.Ct. 2618 (“ ‘First ... Amendment rights [ ] are different in public schools than elsewhere.’ ”) (quoting Vemonia Sch. Disk Jp7J v. Acton, 515 U.S. 646, 656, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)). Indeed, in his Morse concurrence, Justice Alito essentially recognized that Tinkers substantial-disruption test does not apply to students’ off-campus expression. See id. at 422, 127 S.Ct. 2618 (Alito, J., concurring) (noting that Tinker allows schools to regulate “in-school student speech ... in a way that would not be constitutional in other settings”). Accord Sypniewski v. Warren Hills Reg’l Bd. of Educ., 307 F.3d 243, 259 (3d Cir.2002) (stating that under Tinker, a “broader ... area of speech can be regulated at school than outside school”).
The Second Circuit addressed a school’s punishment of off-campus speech in Thomas v. Board of Education, Granville Central School District, supra. There, a public high school suspended students for publishing an “underground” newspaper, which was “saturated with distasteful sexual satire, including an editorial on masturbation and articles alluding to prostitution, sodomy, and castration.” 607 F.2d at 1045 n. 3. Although the students had composed “an occasional article” in the school building after classes, the rest of the publication process, including printing and distribution of the newspaper, had occurred off campus after school hours. Id. at 1045. The students were suspended after a teacher confiscated a copy of the newspaper that another student had taken to school. In the ensuing § 1983 suit, the Second Circuit concluded that Tinker did not control because the newspaper was best viewed as off-campus speech. Id. at 1050. The court therefore applied general First Amendment law, determined that the school’s actions were unconstitutional, *939 and invalidated the students’ suspensions. Id. at 1050-53.
The Fifth Circuit followed suit in Porter v. Ascension Parish School Board, supra. There, while sitting in the privacy of his own home, a high school student drew a picture of his school being attacked by missiles, helicopters, and armed assailants. 393 F.3d at 611. The student stored the picture in his closet. The school learned of the drawing when the student’s younger brother inadvertently took it there. The school expelled the student. In the civil-rights action that followed, the Fifth Circuit determined that the picture amounted to off-campus speech and thus declined to apply Tinker, holding that it governs only “student expression ‘that ... oceur[s] on the school premises.’ ” Id. at 615, 619 (quoting Kuhlmeier, 484 U.S. at 271, 108 S.Ct. 562). Applying general First Amendment principles, the court concluded that the picture was not a “true threat,” see Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), and therefore was protected expression. Id. at 617-18. See also Bystrom v. Fridley High Sck, Indep. Sck Dist. No. H, 822 F.2d 747, 750 (8th Cir.1987) (Arnold, J.); Lee Goldman, Student Speech and the First Amendment: A Comprehensive Approach, 63 Fla. L.Rev. 395, 430 (2011) (arguing that Tinker should not be applied to students’ off-campus speech); Mary-Rose Papandrea, Student Speech Rights in the Digital Age, 60 Fla. L.Rev. 1027, 1093 (2008) (“[T]he Tinker approach to student speech is ill-suited to deal with off-campus expression.”).
I agree with Thomas and Porter, and I believe that various post-Tinker pronouncements of the Supreme Court support their ratio decidendi. Applying Tinker to off-campus speech would create a precedent with ominous implications. Doing so would empower schools to regulate students’ expressive activity no matter where it takes place, when it occurs, or what subject matter it involves — so long as it causes a substantial disruption at school. Tinker, for example, authorizes schools to suppress political speech — speech “at the core of what the First Amendment is designed to protect,” Morse, 551 U.S. at 403, 127 S.Ct. 2618 — if it substantially disrupts school activities. See 393 U.S. at 513, 89 S.Ct. 733. Suppose a high school student, while at home after school hours, were to write a blog entry defending gay marriage. Suppose further that several of the student’s classmates got wind of the entry, took issue with it, and caused a significant disturbance at school. While the school could clearly punish the students who acted disruptively, if Tinker were held to apply to off-campus speech, the school could also punish the student whose blog entry brought about the disruption. That cannot be, nor is it, the law.
To be sure, this case does not involve political speech. J.S. simply published an insulting (and, I would say, mean-spirited) parody of her principal on Myspace. But the lack of political content is irrelevant for First Amendment purposes. There is no First Amendment exception for offensive speech or for speech that lacks a certain quantum of social value. Snyder v. Phelps, — U.S. -, 131 S.Ct. 1207, 1219-20, 179 L.Ed.2d 172 (2011); United States v. Stevens, — U.S.-, 130 S.Ct. 1577, 1586, 1591, 176 L.Ed.2d 435 (2010); Hustler Magazine, 485 U.S. at 55, 108 S.Ct. 876; Cohen, 403 U.S. at 25-26, 91 S.Ct. 1780; FCC v. Pacifica Found., 438 U.S. 726, 763, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (Brennan, J., dissenting) (observing that the Court has consistently “refuse[d] to embrace the notion, completely antithetical to basic First Amendment values, that the degree of protection the First Amendment affords protected speech varies with the social value as *940 cribed to that speech by five [justices]”). It is worth pointing out, as well, that although speech like J.S.’s may appear to be worthless, it does enable citizens to vent their frustrations in nonviolent ways. We ought not to discount the importance in our society of such a “safety valve.” See Rodney A. Smolla, Free Speech in an Open Society 13 (1992).
Furthermore, if Tinker were applied to off-campus speech, there would be little reason to prevent school officials from regulating adult speech uttered in the community. Cf. Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (noting that adults and children generally enjoy the same constitutional rights). Adults often say things that give rise to disruptions in public schools. Those who championed desegregation in the 1950s and 60s caused more than a minor disturbance in the southern schools. Of course, the prospect of using Tinker to silence such speakers is absurd. But the absurdity stems not from applying Tinker to off-campus speech uttered by adults and students alike, but from the antecedent step of extending Tinker beyond the public-school setting to which it is so firmly moored. See Clay Calvert, Off-Campus Speech, Oiu-Campus Punishment: Censorship of the Emerging Internet Underground, 7 B.U. J. Sci. & Tech. L. 243, 280-81 (2001). I would hold that Tinker does not govern a student’s off-campus expression.[2]
But that is only half the battle. The other half: how can one tell whether speech takes place on or off campus? Answering this question will not always be easy. See Morse, 551 U.S. at 401, 127 S.Ct. 2618. The answer plainly cannot turn solely on where the speaker was sitting when the speech was originally uttered. Such a standard would fail to accommodate the somewhat “everywhere at once” nature of the internet. So, for example, I would have no difficulty applying Tinker to a case where a student sent a disruptive email to school faculty from his home computer. Regardless of its place of origin, speech intentionally directed towards a school is properly considered on-campus speech. On the other hand, speech originating off campus does not mutate into on-campus speech simply because it foreseeably makes its way onto campus. See Layshock v. Hermitage Sch. Dish, 650 F.3d 205 (3d Cir.2011) (en banc); Papandrea, supra, at 1090-92. A bare foreseeability standard could be stretched too far, and would risk ensnaring any off-campus expression that happened to discuss school-related matters. See Thomas, 607 F.2d at 1053 n. 18.
In any event, this case does not require us to precisely define the boundary between on- and off-campus speech, since it is perfectly clear that J.S.’s speech took place off campus. J.S. created the My-space profile at home on a Sunday evening; she did not send the profile to any school employees; and she had no reason to know that it would make its way onto campus. In fact, she took steps to limit dissemination of the profile, and the My-space website is blocked on school computers. If ever speech occurred outside of the school setting, J.S.’s did so.
Having determined that J.S.’s speech took place off campus, I would apply ordinary First Amendment principles to determine whether it was protected. I agree with the majority that this was protected speech. The speech was not defamatory, obscene, or otherwise unprotected. See Hustler Magazine, 485 U.S. at 57, 108 *941 S.Ct. 876; Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). J.S.’s suspension, then, violated the First Amendment.
J.S. said vulgar, offensive things about her principal on Myspace. And she went beyond that. She wrote cutting, mean-spirited things about members of his family. If we could suppress her speech without silencing other, more deserving speakers, public discourse would suffer no harm. But courts have long disclaimed the ability to draw a principled distinction between “worthless” and “valuable” speech. We must tolerate thoughtless speech like J.S.’s in order to provide adequate breathing room for valuable, robust speech — the kind that enriches the marketplace of ideas, promotes self-government, and contributes to self-determination. Without condoning her disrespectful and mean-spirited tone, I support J.S.’s right to say the things she said free from government punishment.

. Assuming arguendo that Tinker did apply to students' out-of-school speech, I agree with the majority that the school district has failed to satisfy the substantial-disruption test.