LOKEN, Circuit Judge,
dissenting.
This is a difficult case raising important First Amendment issues. I agree with the district court that Iowa State University administrators over-reacted to a publicly sensitive situation, warranting injunctive relief, though I would not affirm the court’s permanent injunction as worded.[9]1 write separately to dissent from our court’s decision to deny the individual Defendants qualified immunity from the Plaintiffs’ claims for compensatory damages and attorneys’ fees.
“Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.” Sutton v. Bailey, 702 F.3d 444, 449 (8th Cir. 2012), quoting Messerschmidt v. Millender, 565 U.S. 535, 546, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012), In my view, the ISU administrators were neither plainly incompetent nor knowing lawbreakers. “Many aspects of the law with respect to students’ speech ... are difficult to understand and apply. ... Public officials need not predict, at their financial peril, how constitutional uncertainties will be resolved.” Hosty v. Carter, 412 F.3d 731, 739 (7th Cir. 2005) (en banc), cert. denied, 546 U.S. 1169, 126 S.Ct. 1330, 164 L.Ed.2d 47 (2006).
A public official is entitled to qualified immunity if his or her conduct “does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Mullenix v. Luna, — U.S. -, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quotation omitted). The court denies the Defendants qualified immunity, concluding it was clearly established at the time in question (i) “that ISU’s trademark licensing pro *717 gram was a limited public forum,” (ii) that Defendants engaged in viewpoint discrimination (a conclusion requiring a determination of purpose or motive the court makes based on inferences drawn from a summary judgment record), and (iii) “that a university may not discriminate on the basis of viewpoint in a limited public forum.”
Repeatedly, the Supreme Court has cautioned that “clearly established law should not be defined at a high level of generality.” White v. Pauly, — U.S. -, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (quotations omitted). Rather, “clearly established law must be particularized to the facts of the case.” Id. (quotation omitted). In a public school or university setting, “educators are rarely denied immunity from liability arising out of First-Amendment disputes. The rare exceptions involve scenarios in which a factually analogous precedent clearly established the disputed conduct as unconstitutional.” Morgan v. Swanson, 755 F.3d 757, 760 (5th Cir. 2014) (citation omitted); cf. Wilson v. Layne, 526 U.S. 603, 618, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); Keefe v. Adams, 840 F.3d 523, 541 (8th Cir. 2016) (Kelly, J. concurring), cert. denied, — U.S. -, 137 S.Ct. 1448, 197 L.Ed.2d 650 (2017). The court cites no case in which school officials administering a trademark licensing program violated, or were even accused of violating, the First Amendment by denying proposed uses of the school’s registered trademark.
This case presents two uncertain First Amendment issues that warrant qualified immunity: (1) whether a trademark licensing program that allows student groups to associate their messages with the university’s symbol or logo is a form of government speech or a limited public forum; and (2) if the program is a limited public forum, whether administrators’ decisions to restrict the licensing of designs associating the university with unsafe or illegal activities such as drug use constitute unlawful viewpoint discrimination or permissible content regulation.
A. Long before ISU rejected a NORML ISU design, its trademark licensing program guidelines stated that the program exists to promote ISU to the public, because ISU “benefits from public recognition of its names, symbols, logos, and other identifying marks.” The program’s restrictions were necessary to “promote and protect the university’s image.” Student organizations using the marks must adhere to ISU-drafted design standards — each design must state the recognized name of the student organization; use high quality imaging and colors from the ISU official color palette; and avoid vulgar language, profanity, or words with inappropriate double meanings. Multiple guideline provisions warn of the need to avoid “the appearance of a University endorsement.” ISU’s general licensing requirements stated: “No products considered dangerous or offensive will be approved, including but not limited to products causing potential health risks, promoting firearms, drugs, alcohol, gaming, or tobacco.”
Based on these undisputed program policies, it was far from clear prior to this litigation that ISU’s. trademark licensing program was not a form of government speech. If it was government speech, “the Free Speech Clause has no application.” Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). The Court in Summum recognized that “[tjhere may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech.” Id. at 470, 129 S.Ct. 1125. The majority brushes this issue aside, concluding it “was clearly established ... that the government speech doctrine does not insu *718 late a state actor from First Amendment scrutiny when the state has created a limited public forum for speech.” Ante at 709. But this simply begs the question. When the government speaks, “forum analysis is misplaced.” Walker v. Tex. Div., Sons of Confederate Veterans, Inc., — U.S. -, 135 S.Ct. 2239, 2250, 192 L.Ed.2d 274 (2015).
At the time in question, the Supreme Court had decided Summum, holding that privately donated monuments displayed on public property were a form of government speech. 555 U.S. at 481, 129 S.Ct. 1125. Our court had held that a university radio station’s decision not to air an acknowledgment of a Ku Klux Klan contribution was government speech, even though the station accepted and acknowledged contributions from a diverse array of groups. Knights of Ku Klux Klan v. Curators of Univ. of Mo., 203 F.3d 1085, 1095 (8th Cir.), cert. denied, 531 U.S. 814, 121 S.Ct. 49, 148 L.Ed.2d 18 (2000). More recently, the interpretation of government speech has broadened. In 2015, a divided Supreme Court extended the doctrine to Texas’s decision to exclude from its specialty license plate program a design proposed by the Sons of Confederate Veterans. The majority reasoned that “[t]he governmental nature of the plates is clear from their faces,” and “a person who displays a message on a Texas license plate likely intends to convey to the public that the State has endorsed that message.” Walker, 135 S.Ct. at 2248-49.[10] That same year, the Eleventh Circuit concluded that private advertising banners printed in school colors, subject to school design requirements, and displayed on school fences were government speech because “observers reasonably believe the government has endorsed the message.” Mech v. Sch. Bd. of Palm Beach Cty., Fla., 806 F.3d 1070, 1076-77 (11th Cir. 2015), cert. denied, — U.S. -, 137 S.Ct. 73, 196 L.Ed.2d 35 (2016).
Here, Defendants’ actions were based on their concern that NORML was trading on the notion that use of ISU’s trademark reflected university support. Indeed, the dispute was triggered when NORML’s President bragged in the Des Moines Register that the trademark licensing approvals reflected “nothing but support from the university,” support for the group that was “blowing our minds.” The court asserts that Defendants then reacted to a “political controversy” after inquiries from “the governor’s office and an Iowa House Republican Caucus staff person.” Ante at 706. But the record reflects widespread adverse public reaction to the Register article, including one parent of an ISU student who worried that, if Cy “becomes a role model for drug use,” will public school anti-drug programs need to “teach, ‘just say no to C/ ”? On this recorcj, the government speech issue is far more difficult than the court posits; at a minimum, it warrants qualified immunity because the issue is clearly not “beyond debate.” Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011); see, e.g., Summum, 555 U.S. at 481, 129 S.Ct. 1125 (Stevens, J., concurring) (government speech is “recently minted”); Johanns v. Livestock Mktg. Ass’n, 544 U.S. 550, 574, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005) (Souter, J., dissenting) (“The government-speech doctrine is relatively new, and correspondingly imprecise.”); Mech, 806 F.3d at 1074 (“The Supreme Court has not articulated a precise test for separating government speech from private speech.”).
*719 B. In concluding that ISU’s trademark licensing program is a limited public forum, the court relies primarily on Rosenberger v. University of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), which held that a public university violated the First Amendment when it excluded all religious groups from a program that -widely distributed funds for printing student publications. While Rosenberger is clearly relevant, it does not definitively answer whether the ISU trademark program created a limited public forum, and if so, the extent to which the First Amendment limits administration of that program. Like the funding program in Rosen-berger, the trademark program was open to a wide variety of student groups. But unlike a program that simply funds student activities, the trademark program allowed student groups to place ISU’s most prominent public symbol side-by-side with a student organization’s message, sometimes, as in this case, leading the public to believe that ISU endorsed the message, no matter how hard ISU attempted to counter that assumption.
“A limited public forum, like a nonpublic forum, may be ‘limited to use by certain groups or dedicated solely to the discussion of certain subjects,’ and the public entity ‘may impose restrictions on speech that are reasonable and viewpoint-neutral.’ ” Victory Through Jesus Sports Ministry Found. v. Lee’s Summit R-7 Sch. Dist., 640 F.3d 329, 334-35 (8th Cir.) (citation omitted), cert. denied, 565 U.S. 1036, 132 S.Ct. 592, 181 L.Ed.2d 424 (2011). In determining whether a public university is “confining a [limited public] forum to the limited and legitimate purposes for which it was created” in a viewpoint-neutral manner, courts must distinguish “between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum’s limitations.” Rosenberger, 515 U.S. at 829-30, 115 S.Ct. 2510. Content regulation permits the school to “reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker’s view.” Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In denying the individual Defendants qualified immunity, the court ignores this critical distinction.
In the public school or university setting, a limited public forum is not created absent “clear intent to create a public forum.” Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 271, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Though there is no analogous precedent, I agree ISU created a limited public forum when it licensed hundreds of student organizations to use ISU’s trademarks to enhance the students’ public speech. But one of ISU’s central purposes was to protect and promote ISU’s public image, and the program guidelines explicitly “reserve[d] the forum” for this purpose. Id. at 270, 108 S.Ct. 562. A limited public forum created for this purpose may reasonably deny access to uses that convey the perception that ISU endorses the message — which NORML publicly conveyed — or that appear to link ISU to unsafe or illegal activities such as illegal drug use.
Speech restrictions of this kind are permissible content regulation so long as they are “reasonable and not an effort to suppress expression merely because public officials oppose the speaker’s view.” Perry, 460 U.S. at 46, 103 S.Ct. 948. And it is not sufficient to assume, as the court does, that Defendants were guilty of viewpoint *720 discrimination, as opposed to content regulation, because they scrutinized NORML ISU’s message more rigorously than those of the ISU hockey club and other groups.[11] “The question whether the First Amendment requires a school to tolerate particular student speech ... is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech.” Hazelwood, 484 U.S. at 270-71, 108 S.Ct. 562.
This case raises serious issues that both the. district court and our court do not adequately analyze. First, even if NORML ISU’s primary purpose was law reform, many of the designs Defendants rejected could “reasonably [be] viewed as promoting illegal drug use.” Morse v. Frederick, 551 U.S. 393, 403, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007). For example, T-Shirt Design # 1 had the words “Freedom is NORML at ISU” next to an image of a cannabis leaf; another design showed the ISU mascot next to the text: “NORML: It’s Not For Everyone But It’s Not a Crime.” [12] In Morse, the Supreme Court held, without forum analysis, that a school principal did not violate the First Amendment when she confiscated a student banner reading “BONG HiTS 4 JESUS” because “the sign advocated the use of illegal drugs.” Id. at 402, 127 S.Ct. 2618. Second, even if Defendants acted because NORML was using ISU’s trademark to advocate controversial law reform, rather than because NORML was promoting illegal drug use, does the First Amendment require that administrators of a limited public forum created to promote a public university permit participation by those advocating law reform, when there are many other avenues of speech open to student advocates? Third, what specific student uses of this limited public forum must be approved because rejection would not be reasonable, therefore permissible content regulation? Surely not every picture of a cannabis leaf with Cy must be approved. In my view, these difficult .and complex issues make clear why the individual Defendants are entitled to qualified immunity.
For the foregoing reasons, I respectfully dissent.

. The court permanently enjoined Defendants “from enforcing trademark licensing policies against Plaintiffs in a viewpoint discriminatory manner and from further prohibiting Plaintiffs from producing licensed apparel on the basis that their designs include the image of a similar cannabis leaf.” As I will explain, the term "viewpoint discriminatory” is too vague to satisfy Fed. R. Civ. P. 65(d), and compelling Defendants to approve any design with a cannabis leaf is overbroad.

.- Plaintiff Erin Furleigh confirmed this obvious point, admitting that NORML ISU wanted to use Cy the Cardinal on the group's t-shirts because “you see Cy and you think Iowa State. It’s not just NORML, it’s Iowa State."

. The record reflects that from December 2007 to March 2015, the Trademark Licensing Office received 4,167 student organization submissions; 710 were rejected, 1,139 were approved subject to revision, and 2,195 were approved.

. Rejecting this latter design, the Trademark Office wrote: "I would suggest you use a statement in line with your mission (working to reform marijuana laws).”